## Case No. 3,159.
### COOK v. HAMMOND.
[4 Mason, 467.] [1]

Circuit Court, D. Massachusetts. Oct. Term, 1827.

DESCENT OF REVERSIONS AND REMAINDERS.

1. By the Massachusetts statutes of descent, reversions and remainders after life estates vested by descent in the intestate, pass to his heirs, without any regard to the ancestor from whom he inherited, in the same manner as estates in possession.

[Cited in Stoddard v. Gibbs, Case No. 13,-468.]

2. The common law in such case is different, and gives the estate in reversion to the heir of the first purchaser or reversioner, who is heir at the time when the life estate expires.

3. Under the act of 1783, c. 36 [1 Laws Mass. 105], the eldest son took a double portion in remainders and reversions as well as in estates in possession.

This was a writ of entry. The parties agreed upon a statement of facts as follows: "The above action is brought by the plaintiff [Horatio G. Cook] to recover possession of certain undivided portions of the lands and tenements described in the writs against the defendant [Samuel Hammond], who claims to hold possession under Eli Leavitt and Jane his wife in her right, who dispute the plaintiff's title; and the following are the facts agreed upon between the parties: In the year 1770 Royal Tyler died seised in fee of the demanded premises, leaving three children, viz. John S. Tyler, Royal Tyler, and Jane Tyler. The eldest son relinquished his right to a double share according to the existing law; and the three became seised in fee as tenants in common, each of one undivided third part. Jane afterwards intermarried with David Cook, by whom she had two children, viz. the plaintiff, and Mary Tyler Cook, his sister. Jane Cook died in 1786, so seised of such third part, leaving those two children and her husband, whereby he became seised as tenant by the curtesy. Mary, the daughter, died during his life, in 1809. David Cook, after 1786, married a second wife, by whom he had three children, viz. Charles, Jane, wife of the said Leavitt, and Royal. David Cook died in 1823, he or his assigns continuing until that time in possession under his title, as tenant by the curtesy. It is considered immaterial, for the purpose of the present inquiry, whether Mary Cook, the sister of the plaintiff, left issue capable of inheriting. It being agreed, that she shall be considered as having died without any; leaving any question, that could arise, if there be such, to be settled between them and the plaintiff or defendant. as there may be occasion. Upon this statement two questions are presented to the court: (1) Whether the demanded premises, of which Jane Tyler died seised. belong exclusively to the plaintiff, or to him

[1] [Reported by William P. Mason, Esq.]

and the defendant, according to their respective proportions, as tenants in common. (2) And if to them, as tenants in common, then, whether the plaintiff is entitled to a double share of his mother's estate; or whether he is only entitled to one moiety by inheritance from her, and saving any further right to the inheritance of his sister or father."

C. G. Loring for plaintiff.

The plaintiff is the sole owner of the demanded premises. being at the time of descent cast, viz. at the death of the tenant by the curtesy, the only surviving legal heir of Jane Tyler Cook, the last owner actually seised; Mary Cook having died before the tenant by the curtesy, and therefore never having been so seised of an estate in the premises, as to become a new stock of inheritance, whereby any portion passed to her father at her decease, and through him to the defendant.

It is an unyielding maxim of the common law, that a demandant of real estate must prove himself heir of the owner last actually seised; a mere legal seisin not being sufficient to constitute a stock of inheritance. 1 Inst. 14, 15, 241b, § 394; Watk. Desc. 65–67, 110, 112; 3 Cruise, Dig. 461–465. And this maxim operates so effectually as, in some cases, to counteract another favorite principle of the common law, viz. That the half blood cannot inherit. 1 Inst. 146; Watk. Desc. 67, 112, notes; 3 Cruise, Dig. 465. The doctrine that a tenancy for life suspends the descent during its continuance is recognized in New York. Jackson v. Hendricks, 3 Johns. Cas. 214; Bates v. Shraeder, 13 Johns. 260. This, then, was the common law, originally brought by our ancestors to this country (see Whitney v. Whitney, 14 Mass. 88); and the plaintiff is thereby entitled to the whole estate, unless it has been altered by statutory enactment, or universal consent or usage, coeval with the existence of our civil community, so as to constitute a part of the common law peculiar to ourselves, "that a reversion is descendible through an intermediate ancestor, during the continuance of the particular estate." If such a change had taken place, by usage or universal consent, it is inconceivable that it should not have been expressly recognized in our books of reports, and been generally known to the profession; yet no case can be found, in which it is acknowledged; and that the profession are not generally aware of it, is apparent from the circumstance, that this maxim, "seisina facit stipitem," is recognized in the earliest publication in this state upon land titles, and is laid down unqualifiedly in a recent treatise, by one of the most learned lawyers in the commonwealth, as a leading principle of the law of descents. Sull. Land Tit. 153; Stearns, Real Actions, 29, 30, 32–34. The same doctrine is necessarily to be inferred from the case of Whit-

ney v. Whitney, above cited. And although it was there adjudged that the common law has been so far altered by statute, that a reversion is liable for the debts of a mesne reversioner, who dies during the continuance of the particular estate, that decision is in perfect accordance with the common law of England, reference being had to the distinctions there prevailing between debts by specialty and those by simple contract. For in England, if the mesne reversioner had bound himself by a bond, or suffered a judgment, for satisfaction of which his real estate could be taken, such a reversion would be assets in the hands of the heir; the giving such bond, or suffering such judgment, being considered equivalent to an entry and actual seisin; and here, therefore, where all debts, whether by specialty or simple contract, are of equal worth, and the real estate is equally liable to be taken for all, it is but reasonable to infer, that the legislature, in declaring that "all the real estate of the deceased should be liable for his debts," meant to include all that by the common law was considered as his, for that purpose.

The common law doctrine of descents, therefore, remains the same here as in England, unless it has been altered by statute. Has it then been so altered? The colony law of 1641 provided, that "the county court should divide and assign to the children or other heirs their several portions out of the estate." Mass. Anc. Chart. & Laws, 205. The act of 4 W. & M. 1692, provided, "that every person lawfully seised of any lands, tenements, or hereditaments in his own proper right, in fee simple, shall have power to devise the same;" and if he died intestate, the judge of probate was to distribute the real and personal estates. Mass. Anc. Chart. & Laws, 230. The first enactment of this commonwealth upon the subject was by the act of 1783, c. 36 [supra], which reads thus: "When any person shall die seised of lands, tenements, or hereditaments, not by him devised, the same shall descend, &c.; and when there are no children of the intestate, the inheritance shall descend to the next of kin." It cannot reasonably be assumed, that any of the terms used in these statutes can be considered as intended to subvert a previously well settled rule of the common law. Lands, tenements, and hereditaments were all descendible before they were enacted; and the only purposes of these statutes were to regulate the course of their descent, and not to make estates inheritable, which previously were not so. Had such been the intention of the lawgivers, specific mention would have been made of the estates which were thus to be invested with a quality so new and important, or terms necessarily comprehending them would have been used. A reversion does not, strictly speaking, fall within either denomination of estates mentioned. It is not lands nor tenements, but a prospective right to them; nor is it a hereditament, for that is a right to something issuing out of them, as rent, &c. It is worthy of remark, too, that the word inheritance, does not include a reversion, according to its common law signification; the descent being suspended during the continuance of the particular estate, so that if the mesne reversioner die before its termination, his heir does not take it by inheritance from him, and it is not therefore an inheritance to descend to his next of kin. If, therefore, so great a change in this important branch of the law had been intended, it certainly would not have been thus left to doubtful construction.

The language of the New York statute of descents is precisely similar to that of our own above cited; but in the cases above referred to, it was held, that their statute had not altered the common law in this particular. If these views are correct, the only remaining inquiry on this point is, whether the statute of 1805, c. 90 [2 Laws Mass. 146], has made the alteration contended for. It enacts, that "when any person shall die seised of any lands, tenements, or hereditaments, or of any right thereto, or entitled to any interest therein, in fee simple or for the life of another, not having lawfully devised the same, the same shall descend in equal shares to his children, and to the lawful issue of any deceased child by right of representation; and when the intestate shall leave no issue, the same shall descend to his father." If these terms had been used in the first statute of descents, framed by a community in which no previously established rules had existed, there could be, perhaps, but very little doubt, that they were intended to comprise all the various estates known in the law, and to give to all a descendible nature. But when it is remembered, that certain well known fixed rules of law, deciding what were, and what were not, descendible estates, had existed from the creation of the community up to the time of that statute, unchanged and undisputed; and that the statute was enacted, not for the purpose of determining the descendible characters of various estates, but merely to designate with greater certainty to whom they should go (see Sheffield v. Lovering, 12 Mass. 490), it may fairly be presumed, that if any radical change were intended, like that contended for by the defendants, the precise estates, whose natures were to be thus altered, would have been named, and the words "reversions" and "remainders" would have been specifically used. Nor is it credible, that if such a change were then for the first time made, that there should not have been a perfect understanding to that effect, on the part of those concerned in the administration and exposition of the laws; whereas, since the enactment of that statute, Professor Stearns, as above cited, lays down the old common law principle as being still in full force as

the law of the land; and the supreme court of the state, in the case of Whitney v. Whitney, above cited, both in language and by the nature of the decision, recognise it as such.

The whole question in that case was, whether a reversion was assets in the hands of the administrator of the mesne reversioner, who had died during the continuance of the particular estate. Now, if the statute, last mentioned, had made a reversion descendible to his heir, what question could there be of its being assets in the hands of his administrator. It would, in such case, have been his real estate, to all intents and purposes, as much as any other; and must, of course, have been administered upon as such. The only ground of contention must have been, that the inheritance was suspended, so that at his decease nothing passed to his legal representatives upon which they could administer, or for which they could be accountable as assets. If, then, it had been considered as the common law of the state, or if the statutes above quoted had been construed as establishing it as the law, that a reversion descended from the mesne reversioner, no such question could have arisen; it would have been a minor proposition so evidently contained in the major one of the descent, as to be entirely unworthy of discussion. The elaborate opinion, therefore, given in that case, to prove that a reversion is assets in the hands of an administrator of the mesne reversioner, shows that the supreme court of the commonwealth disavows the construction of the statutes contended for by the defendants. Or at least it can hardly be imagined that the court, in giving an opinion embracing the general history of the common law upon this subject, should have simply stated the alteration inferred from the clauses in the statutes providing for the payment of debts, and not have alluded to the still greater change of the rule of descents, when such change, if it had been made, would have been a conclusive argument in favor of the decision there given.

Upon these views, the plaintiff relies for judgment in his favor, as being entitled to the whole of the demanded premises. Should it, however, be otherwise adjudged, it will become necessary to consider the second question proposed, viz. whether the plaintiff is entitled to a double portion, or takes equally with the defendant. If the first question be decided in favor of the defendant, I am at a loss to conceive of any doubt upon this point. For by the statute of 1783, above cited, it was enacted, that the eldest son should inherit a double portion of the real estate of his intestate parent, which provision was not repealed until the year 1789; consequently, as Jane Tyler Cook died in 1786, leaving the plaintiff and Mary Cook her only issue, the reversion of her real estates, if descendible during the continuance of the particular estate, vested immediately

according to the rule in the statute of 1783, and two third parts became instantly and permanently vested in the plaintiff, and the remaining third part in his sister; the rule of descents, existing at the time of descent cast, determining the right of inheritance. Jackson v. Hendricks, 3 Johns. Cas. 214. The only ground, therefore, upon which the defendant could claim to be entitled equally with the plaintiff, must be by maintaining the common law rule as unaltered, and assuming to be, at the time of the descent cast (viz. at the death of the tenant by the curtesy), the legal heir, jointly with the plaintiff, of Jane Tyler Cook, claiming through their father and his daughter, Mary Cook, by virtue of the provision in the statute making him heir of her real estate, and thus giving to that provision the effect of constituting him a representative of his child in such manner, as to make him a legal heir of the mother; a construction which, it is presumed, neither the language nor policy of the statute will, in any degree, authorize.

C. S. Daveis, for defendant, conceded the main point contended for by the counsel for the demandant, viz. that curtesy suspends descent, to be well settled as law in the time of Lord Coke, who says, that the whole common law was so clear, that he knew but two points doubted in all his time. A contrary position, however, had prevailed under preceding reigns; and was holden by the whole court in the time of Henry VII., as appears by the context to Littleton (section 394). In New York the English doctrine has obtained, in consequence of the adoption of the common law of descent prior to the Revolution; and the subsequent statute of descents establishing the rules of the common law in all cases not expressly provided. But it has not been recognized in Massachusetts; and the principle does not belong to her jurisprudence. A better doctrine has dawned in the decisions that have taken place, more consonant to the character of the early law of England, and supported by several of the principles and analogies of the common law itself.

By the operation of the common law as a general rule, the descent of the reversion is suspended, in some measure, during the continuance of the particular estate. Yet the reversioner may enter in his own title to secure his own rights, and may gain a sufficient seisin by the entry, or other exercise of right, to give efficacy to his grant, and prevent any departure of the inheritance. A reversion is not esteemed assets, at common law, for the reversioner's debts; still he may charge it with them, by binding his heirs in the form of the obligation. Also, judgment against him will bind the estate, although no execution be taken out until the estate have actually descended. Again, debt will lie against the heir of an obligor from whom nothing has descended in fee simple except

a reversion, and a special judgment and extent framed thereupon. These cases are collected by Cruise, who justly classes reversions under the general denomination of vested interests. There must be a power to protect the inheritance, and that right resides in the reversioner. An action of waste will lie for the heir against the tenant in dower, or the tenant by curtesy; and the estate is vested by forfeiture. 4 Burrows, 2141; 3 Rep. [Coke] 23. In dower, also, descent is suspended as to the part set off, so that only two thirds are deemed to descend in fee, as curtesy is said to suspend the descent of the whole; yet the heir is punishable for not setting out dower. Such is the genius of the common law in respect to the descent of reversionary rights. But the demandant grounds his case upon the strict maxim of the common law, "non jus sed seisina facit stipitem." The foundation of this maxim lies in the feudal constitution, which required, that whoever claimed by descent should make out a strict pedigree, as heir from the first purchaser. But as in the course of time it might be rendered difficult to trace a genealogy, probably obscured and perplexed, it became an established understanding of this rule, that the seisin of the last possessor should prevail as presumption of his being of the blood of the first purchaser. Still, as it required the union of both bloods of the first marriage to constitute a legitimate representative of the original feoffee, so, under this relaxed construction of the rule, it was made a rigorous condition, that the claimant should be of the whole blood of the one last actually seised. Hence the maxim, "quod possessio fratris de feodo simplici facit sororem esse haeredem," to the exclusion of the brother of the half blood. 1 Inst. 14; 2 Reeve, Hist. Eng. Law, 317; 2 Wood. Lect. § 253; 2 Gu. Bac. Descent, A. C. 29, 30. This principle was preserved in England to secure the escheat against the half blood. It was useful also, under the same system, to protect the right of a disseisee against a descent cast, during the continuance of the estate by curtesy in the surviving husband of the disseisee. This is the express case put in Littleton. And it is pursued as a general proposition, by Chief Justice Kent, (4 Johns. 401), that a descent cast will not affect the right of a remainder-man or reversioner, if a particular estate exist. The principle is likewise maintained in New York in favour of the whole blood; the common law of descent not being entirely abolished, but the spaces left by the statute supplied from the former source. The system of descent, in that state, is composed of the five canons of the statute, and the five rules of the common law, applicable to all cases not especially provided; and the distinction of blood among collaterals is not done away. The decision of Jackson v. Hendricks, 3 Johns. Cas. 214, was grounded entirely on the common law, as the case arose prior to the statute. In Bates v. Shraeder,

13 Johns. 260, it may be doubtful, whether the present point was necessary to be determined. In delivering the opinion in Jackson v. Hilton, 16 Johns. 97, Mr. Justice Spencer reposed on a maxim of law, said by Chief Justice De Gray (3 Wils. 526) to have subsisted for ages, upon the authority of Bracton, Britton, and Fleta, namely, "that lands in fee simple must descend to the heir of the whole blood of the person last actually seised thereof." It cannot be denied, that this is the exact doctrine of the English law, "seisina facit stipitem." This whole doctrine is acknowledged by Sir William Blackstone to be a very fine spun and subtle nicety. At the same time he defends it against the strictures of Locke, in his Essay on Government, and Craig, in his Treatise on Feudal Law, as absurd and derogating from the maxims of equity and natural justice; and vindicates it on the fundamental principles of the law of England, averring the succession of the whole blood itself to be merely a feudal favor. He leaves it, therefore, entirely for the legislature to determine how far it may be expedient to afford relief by amending the law in particular instances, or some private inconvenience should be submitted to, rather than a long established rule should be shaken. Thus it is with the whole system of descent in England. It is supported altogether on the principle of positive establishment; and therefore it is insisted by its apologists, that the numerous and arbitrary rules, by which its course is directed or intercepted, are not open to objection as violations of natural justice. 2 Wood. Lect. 252. The universal answer to all exceptions on this score is given in the brief expression of Lord Kenyon, "lex ita scripta est." Several of its rules, at the same time, the lord chief justice admitted, were rigid, and some might press hard; such, for example, as the exclusion of the half blood, and the exposure of a person, on whom a collateral warranty should descend without assets, to be stripped of all his property. Wisdom or fancy might erect a bolder, more pleasing, perhaps more perfect system; but these rules were nevertheless the acknowledged law of the land; and it was the happiness of his lordship, no less than his duty, to follow and give effect to them. 7 Durn. & E. [Term R.] 415.

Upon these principles of the law of England, in the first place, the fee was not allowed to be inheritable at all. The whole was holden of a superior, who was at once the founder and ultimus haeres of the estate; and when, by the greatest favor granted under the feudal law, when, says Sir William Blackstone, "in the most solemn acts of law, we express the strongest and highest estate that any subject can have, it is seised in his demesne as of fee; that is, not simply and purely his own, since it is held of a superior lord, in whom the ultimate fee resides." 2 Bl. Comm. 105. All rights of real estate were thus reduced to mesne and base inter-

ests, carved out of the lordship of the land. Regard was had to a certain entire representation of the fee, in reference to the condition of a strict personal service or fealty. Hence the selection of the oldest male descendant, or nearest collateral relative, in whom the whole inheritance centered; the favour shown to the eldest son because he was to sit in his father's seat; the authority over his marriage, &c. On these grounds the several persons, among whom these inferior estates were parcelled, were attendant on the lord paramount, the heir for his inheritance, the husband for his curtesy, the reversioner for his reversion, &c. And hence the aversion of this system, through following time, to all those inventions for throwing lands into commerce, or appropriating them to uses, by which these feudal consequences, and especially escheat, might be avoided. But this maxim, "non jus sed seisina," is not recognised as a feature in the jurisprudence of Massachusetts. The obligations of feudal tenure, as expressed by Professor Stearns (page 61), formed no part of the laws of the colony or province. The tenure of free and common socage, established in the colony by the first charter, copied from the royal manor of East Greenwich, was cotemporaneously interpreted by the prescriptive customs of gavelkind, within the county of Kent, where that manor was situated. The tenure, if so it can be termed, subsisting under this construction, can hardly be distinguished from that which once prevailed under the description of allodial. By the ancient laws of England, existing down to the Conquest, lands descended equally among all the children without discrimination. These were the Saxon rules of inheritance, which were confined to the county of Kent, after the Norman Conquest, and reduced to the custom of gavelkind, as appears by Selden, Sir Matthew Hale, and Lord Holt. Hale, C. L. 220; 1 P. Wms. 49.

The doctrine of descent, adopted in the colony under the charter, was quite different from the feudal. It was considered, not a political, but a natural right. Sull. Land Tit. 148. "Haeredes, successoresque sui cuique liberi," is a maxim, not merely confined to the woods of Germany, where it existed with the addition of "Tacitus, et nullum testamentum;" but it is pronounced by Dr. Christian, in his learned and candid notes on Blackstone, to be one of the first laws of nature. The Roman law was, "Ratio naturalis, quasi lex quaedam tacita, liberis parentium, haereditatem addiceret, velut ad debitam successionem, eos vocando." In relation even to the kindred custom of Kent, it is said, by Lord Coke, "that it standeth with some reason, for every son there is as great a gentleman as the eldest son, and perchance will grow to greater honor and valor." Dr. Arthur Browne (1 Civ. Law, 27) represents gavelling as the policy of republics, preventing the prodigious growth of estates, forbidding

"the towering castle to rise, and the immense demesne to spread, and swell the arrogance of primogeniture." Gov. Hutchinson, in his original volume, contemplated the future revolution as the natural result of the existing laws of inheritance, and predicted, that a similar change in the English law would be equally fatal to the British constitution. "Nobis veluti unum cunctis patrimonium." The title secured to the government under the feudal denomination of escheat, on the failure of the line of inheritance, is only a provisional principle of universal municipal law, and only amounts to a kind of caducary succession on the part of the state or sovereign. The Massachusetts law of descent is moulded on the Roman law of succession, which invested the heir with absolute dominion over the inheritance. This is the strong peculiarity pointed out by the accomplished Mr. Butler, in his learned notes on the Institutes, between the feudal and Roman systems of polity, in respect to landed property. The direct dominion of the Roman heir over the inheritance was undiminished by the existence, either of the usus-fructus, or of the fidei-commissary substitution; neither of which suspended the absolute vesting of the estate. Indeed, the civil law considers the parent and son as much the same person, so that the inheritance is not so strictly deemed to descend on the death of the progenitor, as to continue in the possession of the survivor. Dig. 28, 2, 11. The provincial act of 4 W. & M. c. 8 (1692), was copied from the English statute of distributions, 22 & 23 Car. II., extending its provisions to real as well as personal estate, and distributing the residue of the intestate's estate among his children or next of kin. Although this act did not, in express terms, establish a proper system of inheritance, yet the construction given to it by the provincial lawyers always was, that a right of inheritance was determined in the proportions, and among the relations, that the act required the residue to be distributed. The common law doctrine of inheritance was never countenanced in fee simple estates. The fee was constantly considered as vesting in the heirs of the intestate immediately on his death. A question was afterwards raised, however, which, for a time, is related to have been one of considerable expectation; whether brothers and sisters of the half blood were within the same degree of consanguinity under the act of 1692. For a season, it seems, that the common law principle, which excluded the half blood, was stoutly upheld; and the escheat, in preference to the right of the half blood, prevailed in regard to land, notwithstanding the act made no distinction between real and personal estate. This was the last relic of the feudal doctrine of inheritance; and the exclusion of the half blood from the collateral descent is understood to have continued, in the course of practice, until toward the middle of the last century, when the right of the half blood was

established, upon a special verdict, in the case of Hall v. Sprague, in 1748, supposed to be prior to that of Ames and Gay, decided in the superior court at Boston; and this decision has been considered as extending back, and constituting the law of the province. A similar question had arisen in England, upon the statute of distributions, as early as 1690, in the case of Crooke v. Watt [2 Vern. 123], which was ruled in favor of the half blood, affirmed in the house of lords, and never again moved; and with the phraseology of that statute this cotemporaneous construction is supposed to have worked itself into the law of Massachusetts. Sull. Land Tit. 153, 156; 12 Mass. 490.

The rules of descent and distribution of real and personal estate have generally been alike in Massachusetts. The statute of 1805, c. 90, describing descendible estates, expresses "any lands, tenements, or hereditaments, any right thereto, or interest therein, whether in fee simple or for the life of another, of which any person shall die seised." These terms are sufficiently copious and exact to embrace all the various estates existing in law, to which a quality of inheritance could be communicated; and in the well considered case of Sheffield v. Lovering, 12 Mass. 490, it was holden, that the statute was not intended to establish new rules, but to adopt and confirm, in clear and explicit language, the legal construction that had been given to preceding statutes, which had been holden to be the law of the country more than a century. Reversions and remainders are comprehended in the constructions of these provisions. 14 Mass. 92. The question of the inheritable quality of the half blood, against the rule of the common law, was put to rest in this commonwealth, in the case of Sheffield v. Lovering. The original stock, or propositus, was no longer regarded, in that decision, as directing the course of descent. The whole of the father's estate was deemed to descend to his daughter and sole heir, who died in the lifetime of her mother, his dowable widow, leaving half brothers and sisters, children of her mother by another husband; so that the whole became the estate of the daughter, and herself the new stock of inheritance, which passed entirely out of the blood of her father. The distinction of blood is allowed by statute only in respect to the portion of a child, derived from a deceased parent, dying under age, unmarried, and which is disposed of, by virtue of the provision, in the same manner as if such child had died before the parent; but this provision does not operate on the estate of any such child, acquired from any other source. The suggestion of Professor Stearns, therefore, that the rule of the common law, "quod seisina facit stipitem," is received in Massachusetts, is to be received with some considerable limitation. It is admitted, in his excellent treatise, not to apply, in its full force, where the ancestor acquires the estate by purchase, that is, by his own

act; and several cases are mentioned, in which an ancestor may, at common law, transmit to his heirs an estate, of which he was never actually seised. The English rule of law, requiring actual seisin, is so far relaxed in New York, as to permit the formation of an entire new stock of descent in one case, arising out of the different situation of this country, in relation to property of wild and unimproved lands. 14 Johns. 406. In New Hampshire the stock is not regarded as the rule of descent. 2 N. H. 460. In Connecticut, where the distinction of blood is still not quite so stale as it is in Massachusetts, this doctrine has been digested in a series of provisions and decisions, by which the estate descends to the heirs of the legal owner, whether he were seised or not, and without being confined to the blood of the first purchaser; the maxim of "seisina facit stipitem" does not prevail, and curtesy produces no suspension of descent. [Hillhouse v. Chester] 3 Day, 166; [Bush v. Bradley] 4 Day, 306. The statute of 1805. c. 90, § 5, describes the real estate, of which a debtor dies seised, made liable for his debts, in the same terms in which it prescribes the descent of real estate. The former statutes of 1783 and 1784 are considered as containing equivalent expressions, and the same policy is construed to pervade the mass of early colonial and provincial, as well as state legislation on this subject; to wit, to charge the whole of a man's estate with the payment of his debts. Vested remainders and reversions are strictly included in the terms of the former statute, as liable for the debts of the proprietors. The case of Whitney v. Whitney, argued upon by the demandant's counsel, proceeds upon a doctrine altogether different from the common law. It does not go on the supposed ground of charging the reversion with the debts of the heir; but it contemplates an immediate descent of the fee, the statute assuming it to be the estate of the debtor. This doctrine is illustrated by various decisions in Massachusetts. Williams v. Amory, 14 Mass. 20; Penniman v. Hollis, 13 Mass. 429; Dingley v. Dingley, 5 Mass. 535; Bates v. Webb, 8 Mass. 458; Denny v. Allen, 1 Pick. 147. And see 2 Johns. 450; 4 Johns. 60. The spirit of the Massachusetts system is opposed to all suspension or postponement on the casting of descent, or vesting of the inheritance. The doctrine of abeyance is hardly recognized as existing any longer in England, the fee being considered as lodging in the heir until the contingency occurs to take it away. Heirs are seised in law before entry. By our statute they are at once entitled to partition, as tenants in common, this being an incident to the estate. Partition may be had of lands holden in dower; and there seems to be no sufficient reason to distinguish the situation of an estate under curtesy. On the death of the ancestor, the heirs became seised of the estate of inheritance, independent of any subsisting freehold or tenancy for

life. The seisin of the tenant of the particular estate is the seisin of the reversioner, who may enter at common law in his own name to secure his own right, and may, in this commonwealth, enter during the life of the former, if he refuses. Cruise, Dig. tit. 35, c. 14, § 54; 9 Mass. 508; Wallingford v. Hearl, 15 Mass. 471. No public policy remains to be supported by the preservation of the ancient rule of the feudal law; and it is not sustained by any moral principle. For what is there in the nature of the tenancy by curtesy (an estate which the law carves out of the inheritance of the child for the life-time of the father, by reason of his having inheritable issue, of the mother, from whom the descent is derived), that should go to the destruction of the inheritance itself?

STORY, Circuit Justice. Upon the very elaborate and learned arguments at the bar, every matter has been brought before the court, that can assist in forming its judgment. I should have been glad, as this is a point of local law, to have found the principal question adjudicated in our own state tribunals, so that my duty might have been merely to follow their decision. Unfortunately, no such case is known to exist, and it must therefore here receive an original determination. The rules of the common law have been fully stated at the bar, and indeed admit, upon the authorities, of no serious controversy. Where the estate descended is a present estate in fee, no person can inherit it, who cannot, at the time of the descent cast, make himself heir of the person last in the actual seisin thereof; that is, as the old law states it, "seisina facit stipitem." But of estates in expectancy, as reversions and remainders, there can be no actual seisin during the existence of the particular estate of freehold; and consequently there cannot be any mesne actual seisin, which, of itself, shall turn the descent, so as to make any mesne reversioner or remainder-man a new stock of descent, whereby his heir, who is not the heir of the person last actually seised of the estate, may inherit. The rule, therefore, as to reversions and remainders, expectant upon estates in freehold, is, that unless some thing is done to intercept the descent, they pass, when the particular estate falls in, to the person who can then make himself heir of the original donor, who was seised in fee and created the particular estate, or if it be an estate by purchase, the heir of him who was the first purchaser of such reversion or remainder. It is no matter in how many persons the reversion or remainder may, in the intermediate period, have vested by descent; they do not, of course, form a new stock of inheritance. The law looks only to the heir of the donor or first purchaser. But while the estate is thus in expectancy, the mesne heir, in whom the reversion or remainder vests, may do acts, which the law deems equivalent to an actual seisin, and which will change the course of the descent, and make a new stock. Thus, he may by a grant, or devise of it, or charge upon it, appropriate it to himself, and change the course of the descent. In like manner, it may be taken in execution for the debt of such mesne remainder-man or reversioner during his life, and this, in the same manner, intercepts the descents. But if no such acts be done, and the reversion or remainder continues in a course of devolution by descent, the heir of the first donor or purchaser will be entitled to the whole as his inheritance, although he may be a stranger to all the mesne reversioners and remainder-men, through whom it has devolved. These doctrines are fully and learnedly explained by Mr. Watkins in his Essay on Descents, and are so well known, that it seems unnecessary to give to them any illustrative commentary. Watk. Desc. 137 (110), 148 (116), 153 (120). Now the operation of this doctrine in respect to estates in fee in possession, which are subject to dower and tenancy by the curtesy, is very important. In the former case, though the heir at law may obtain an actual seisin by entry into the whole estate, yet, by the assignment of dower, that seisin, as to the third part assigned as dower, is defeated ab initio; for the dowress is in of the seisin of her husband, and her estate is but a continuance of this seisin. The same principle is true of tenant by the curtesy. It is even stronger, for the law vests the estate by curtesy in the husband without any assignment, and even without any entry, if the wife were already in possession, his estate being initiate immediately on issue had, and consummate by the death of his wife. So that there is no chasm between the death of the wife and his possession, as there is in case of the death of the husband and the assignment of dower to the wife, in which there can be a mesne seisin. Watk. Desc. (82) 104. Nothing, therefore, but a reversion passes in such case to the heir. But it is a misnomer to call it a case of suspended descent. In such case of curtesy, the reversion descends and vests absolutely in the heir. He may sell it, incumber it, devise it; and it is subject to execution as part of his property during his life. The descent to the heir is not suspended, but the actual seisin of the fee is not in him, since by law the actual seisin is in the tenant by the curtesy.

Applying these principles to the case now in judgment, it is obvious, that when Jane Tyler, the wife of David Cook, died in 1786, seised of the premises, her husband became tenant thereof by the curtesy, and consequently the reversion thereof alone descended to her children, viz. to Horatio G. Cook (the plaintiff) and Mary T. Cook. By the act of descents of 1783, c. 36 [supra], the eldest son was entitled to two shares, and this right, if at all, took effect at the time of the descent cast; and it is just as applicable to

the case of a reversion or remainder as to a present estate in fee. Nothing has since taken place to devest the title of the plaintiff by descent from his mother, and as the estate has fallen into possession by the death of his father, his reversion has become a present estate to two thirds of the premises in controversy. The great question turns upon the third of the reversion belonging to Mary T. Cook. She died in 1809, and if without issue, and it had been a present estate in fee, her father would have inherited it as her heir. It was but a reversion, and if the rule of the common law be in force here, the plaintiff, being at the time of the death of the tenant by the curtesy the sole heir of his mother, is entitled to take the whole estate. Have our laws abrogated the rule of the common law? By the colonial acts of 1641 and 1649 it was ordered, that "when the husband or parents die intestate, the county court &c. shall have power &c. to divide and assign to the children, or other heirs, their several parts and portions out of the said estate; provided the eldest son shall have a double portion; and where there are no sons, the daughters shall inherit as copartners, unless the court, upon just cause alleged, shall otherwise determine." There is nothing in this language, which points to any particular kind of estates, and the language is sufficiently broad to cover all kinds. By the provincial act of 1692 (4 W. & M. c. 8) it was enacted, "that every person lawfully seised of any lands, tenements, or hereditaments within this province, in his own proper right in fee simple, shall have power to give, dispose, and devise the same," &c. &c.; and if not so disposed of, then "the same shall be subject to a division with his personal estate, and be alike distributed according to the rules hereinafter expressed for intestate estates." Here, again, there is no language discriminating between the various kinds of estates, whether present or in expectancy, unless some stress can be laid on the words "lawfully seised of any lands," &c. the force and effect of which will come under consideration in construing the act of descents, under which the present question arises. The act of 1783 (chapter 36) enacts, that "when any person shall die seised of any lands, tenements, or hereditaments, not by him devised, the same shall descend in equal shares to and among his children, &c., except the eldest son," &c. &c. Another clause declares, that "the real estate shall stand chargeable with all the debts of the deceased over and above what the personal estate shall be sufficient to pay," &c. And throughout the act, there is a studious silence as to any differences in the course of descent of any estates capable of descending. Then came the act of descents of 1805 (chapter 90), which was drawn by Chief Justice Parsons, and after a full explanation of his views, with his permission perused by me, then being a member of the legislature,

and with what little aid and co-operation I could give it, passed into a law. That act provides, that "when any person shall die seised of any lands, tenements, or hereditaments, or of any right thereto, or entitled to any interest therein, in fee simple, or for the life of another, not having lawfully devised the same, the same shall descend in equal shares to his children, &c. &c.; and when the intestate shall leave no issue, the same shall descend to his father," &c. &c. Mary T. Cook died in 1809, and consequently this act regulates the descent of her estate.

The present case is obviously within the words of the act. No reasonable doubt can be entertained, that a reversion is a "right" or "interest" in lands. In truth, it is included under the denomination even of "land," and a grant of land will convey a reversion. Com. Dig. "Estates," B, 12. A fortiori, it is included under the description of "tenement" and "hereditament," for these are words of more extensive import, nomina generalissima. Com. Dig. "Grant," E; Shep. Touch. 88; 1 Inst. 6a. The language of the act is, "when any person shall die seised." But it is not a just construction of the act, to interpret this as intending an actual seisin. Lord Coke says (1 Inst. 153a), "seisin is common, as well to the English as French, and signifies, in the common law, possession." Com. Dig. "Seisin," A, 1. It may be either a seisin in law, or a seisin in fact. Now, without adverting to what constituted, in the ancient law, a seisin in law, as contradistinguished from a seisin in deed, it is sufficient to say, that for centuries the language of the law has been, that a reversioner is "seised" of the reversion, although dependent upon an estate for life. Thus, in Plowden, 191, it was held by the court, that, where a reversion is dependent upon an estate for life, the reversioner, in pleading, may state, that he is seised of the reversion. Watk. Desc. c. 1, §§ 1 (27), 39–44; 2 Bl. Comm. 127. By this no more is meant, than that he has a fixed vested right of future enjoyment in it. If a sense, at least as large as this, were not given to the term "seised," it would follow, that the descent of reversions and remainders vested by purchase in the ancestor, and even of reversions vested in the original donor of the particular estate, would be wholly unprovided for, both by the provincial acts of descents of 1692, and the state act of 1783. Cases of this sort must have been innumerable, and yet no doubt ever was entertained, that the descent of such remainders and reversions was provided for by these acts. My opinion is, however, that the word "seised," used in all these acts, has a broader signification, and such as belongs to it in common parlance. It is equivalent to "owning;" and "seisin" is equivalent to "ownership." My reason is, that otherwise none of these acts would regulate the descents of estates, whereof the ancestor, at the time of his death, was disseised; and

yet, from the first existence of these acts, up to the present day, it has always been understood, that the descent of estates from the disseisee, was to the same heirs as would inherit, if he died in the actual seisin. The language of the provincial act of 1692 is, "any person lawfully seised;" but that of the acts of 1783 and 1805 is, any person who "shall die seised." Upon a descent, therefore, cast from an ancestor, who was disseised in his life-time, and died disseised, no title would pass to his heirs under these acts (but pass to the heir at common law), if we did not interpret the word "seised" as equivalent to "owning" or "entitled to;" and this, as far as my knowledge extends, has been the uniform interpretation. If, however, any doubt whatsoever could remain on this point, it is put completely at rest by the supplementary clause in the act of 1805; "or of any right thereto, or entitled to any interest therein." And as one object of that act was to clear away latent ambiguities, and to affirm the settled construction upon the former acts, these words seem appropriate for the very purpose under consideration. I confess I should not have entertained any doubt as to the true construction, without them. There are other parts of these acts, which satisfy my mind, that the legislature intended, by them, to provide effectually for the descent of all the real estate of the intestate. The phrase, "real estate," occurs frequently in the acts, as of the same import with the words, "lands, tenements, and hereditaments;" and the provision, making the "real estate" of the intestate liable to his debts, was evidently meant to be co-extensive with the property, which would pass by descent. If the legislature, by these acts, meant to provide a system of descents for all the real estate, which is vested in the intestate at the time of his death, and refer to him alone as the stock of inheritance as to such real estate, upon what ground can resort be had to the common law for a rule of descent in the present case. The legislature has nowhere named reversions or remainders, as entitled to a distinct course of descent. It has nowhere stated, that the heir must make himself heir, when the estate falls into possession of the original reversioner, or of the purchaser of such remainder. It has been perfectly silent on this subject; and has uniformly looked to the last intestate, as the stock of descent of the real estate vested in him; and in one or two excepted cases only (as of a child dying under age, &c.) has made a special provision, interfering with the general policy of the acts. These very exceptions are strong to show, that no others were intended. If the argument at the bar can be maintained, then this is a case wholly unprovided for by any statute, and the descent is to be regulated by the canons of the common law. But if reversions and remainders are out of the statute, so far as respects the stock

of inheritance, what ground is there to stop here, and not apply the same rule to the heirship? If the statute meant to leave the rule of the common law in force, as to reversions and remainders, then the heir at common law, that is, in case of several children, the eldest son, is entitled to take the whole. Upon what principle can we apply our canons of descent to reversions and remainders to ascertain who are the heirs, and, at the same time, refuse the like application as to who is the ancestor, or stock of inheritance? If our statutes do not contemplate cases of reversions and remainders, then such cases are to be governed wholly and exclusively by the common law. Such a doctrine has not, as I recollect, been asserted.

The present question must have often occurred, in many cases of dower, and in still more numerous cases of tenancy by the curtesy. Yet hitherto there has been a total silence among the profession on the subject. There has not been any case within the memory or tradition of any man, in which such a right has been asserted or acquiesced in, as the plaintiff now claims. Judge Trowbridge, in his reading on the statute of distributions (Precedents, Declar., Ed. 1802, p. 290) of 1692, makes no allusion to any such doctrine; and yet if it had been stirred, it could scarcely have escaped his learned mind, and must have constituted a very important part of his reading. I have a note of a very memorable case (Ames v. Gay), in which the question must have arisen, and must have been decided, if there had been any such doctrine then afloat. My note states, that the case was an ejectment decided on a special verdict in 1749, and that the facts were as follows: One Fisher was seised of the estate in question, and devised the same to his wife, during her widowhood, remainder in fee to his daughter Mary, who was the wife of the demandant. The testator died, and afterwards, during the life of Fisher's widow, Mary, the devisee, died, leaving an only child, Fisher Ames, who afterwards died without issue, and intestate. Afterwards the widow of Fisher died, and thereupon the demandant brought the suit, as heir of his son, Fisher Ames. The defendant (Gay) claimed the estate as husband of the niece of Mary, the wife of the demandant. The court, after argument, gave judgment for the demandant. I have understood, that this was the first cause in which the point was decided, that the father could inherit from the son, under the provincial act of 1692. But it presents the identical question now before the court, and the father could not have recovered, if the plaintiff's argument is now well founded.[2] The case of Williams v. Amory, 14

[2] The following is a copy of the record in the case of Ames v. Gay: "Suffolk—ss. At his majesty's superior court of judicature, court of assize and general gaol delivery, begun and held at Boston, within and for the county of Suf-

Mass. 20, seems to have proceeded upon the ground, that a remainder-man, who died before the expiration of the tenancy for life, was a proper stock of descent. In that case the intestate took by purchase, and therefore was at common law a proper stock of inheritance, and as he left only one child, the descent was the same as at the common law. The court, however, took no notice of the case in this particular view. But the court there decided that remainders and reversions were, under our laws, liable to be taken in

---

folk, on the third Tuesday of August, being the 15th day of said month, Anno Domini 1749, Nathaniel Ames, of Dedham, in the county of Suffolk, physician, plaintiff, against Benjamin Gay, of Dedham aforesaid, yeoman, defendant, in a plea of review of a plea of ejectment, commenced and prosecuted by the plaintiff against the defendant at an inferior court of common pleas, held at Boston aforesaid, for the said county of Suffolk, on the first Tuesday of October, A. D. 1746, in the words following: viz. 'In a plea of ejectment, wherein he demands against the said Benjamin a messuage and about half an acre of land, with the appurtenances thereof, in Dedham aforesaid, bounded southerly by the county road, westerly by Mr. Samuel Dexter's land, northerly and easterly by the said Nathaniel Ames's land, or however otherwise bounded; and saith, that on the twenty-fifth day of March, A. D. 1729, one Joshua Fisher was seised of the tenements aforesaid with the appurtenances in his demesne as of fee, and being so seised thereof by his last will in writing of that date, devised the same to Hannah Fisher, his wife, to hold and improve during her widowhood; and by the same will further devised the same tenements, with the appurtenances, to his daughter Mary, to hold to her and her heirs from, or immediately after, the death or marriage of the said Hannah, whichever should first happen; and afterwards, viz. on the eleventh of March, A. D. 1730, the said Joshua died so seised thereof, after whose death the said Hannah entered into the tenements aforesaid, and by force of the devise aforesaid became seised of the same, with the appurtenances, in her demesne as of freehold for the term of her life, determinable upon her marriage, and the said Mary was thereupon seised of fee and right of and in the remainder of the same tenements, with the appurtenances, expectant upon the death or marriage of the said Hannah; and the said Mary, being so seised of the remainder aforesaid, afterwards took to her husband the said Nathaniel Ames, by force whereof the said Nathaniel and Mary were seised of the aforesaid remainder of said tenements, with the appurtenances, as of fee and right, in right of the said Mary; and afterwards, viz. on the twenty-fourth day of October. A. D. 1737, had issue betweeen them lawfully begotten, viz. a son, named Fisher Ames; and afterwards, viz. on the eleventh of November, A. D. 1737, the said Nathaniel and Mary, being so seised of the remainder of the said tenements, with the appurtenances, in form aforesaid, in her right, she, the said Mary, at Dedham aforesaid, died so seised, after whose death the remainder in fee of the tenements aforesaid, with the appurtenances expectant, as aforesaid, descended to the said Fisher Ames, as only child and heir of the said Mary, whereby he, the said Fisher Ames, was seised of the remainder of the same tenements with the appurtenances, as of fee and right, expectant upon the death or marriage of the said Hannah; and afterwards, viz. on the seventeenth of September, A. D. 1738, the said Fisher Ames, at Dedham aforesaid, died thereof so seised and intestate, leaving neither wife nor child; after whose death, the remainder in fee of and in the said tenements, with the appurtenances, expectant upon the death or marriage of the said Hannah, by force of the province law, made in the fourth year of the reign of King William and Queen Mary, for the settlement of, and distribution of the estates of intestates, came, and fell to the said Nathaniel, the father of the said Fisher Ames, as next akin to him the said Fisher Ames, the intestate; whereby the said Nathaniel became seised of the remainder of the same tenements, with the appurtenances, as of fee and right, expectant upon the death or marriage of the said Hannah; and afterwards, viz. on the twenty-first day of December, A. D. 1744, the said Hannah continuing in her widowhood, and being seised of the said tenements and appurtenances in her demesne as of freehold, for the term of her life, determinable as aforesaid; and the said Nathaniel also being seised of the remainder thereof as of fee and right, expectant as aforesaid, she, the said Hannah, at Dedham aforesaid, died of such her estate so seised; whereupon the tenements aforesaid, with the appurtenances, by force of the province law aforesaid, came, and belonged to the said Nathaniel, to hold to him and his heirs, and he ought to hold the same, and be in the possession thereof accordingly. Yet the said Benjamin Gay hath illegally entered into the said tenements and appurtenances, and unjustly holds him out of the same; to the damage of the said Nathaniel Ames (as he saith) the sum of a thousand pounds.' And at the superior court of judicature, held at Boston aforesaid, for the said county of Suffolk, on the third Tuesday of February, A. D. 1746, the aforesaid Benjamin Gay recovered judgment in said action against the said Nathaniel Ames for costs of court, which were taxed at thirty-five shillings and six-pence, which judgment the said Nathaniel Ames saith is wrong and erroneous, and that he is thereby damnified the sum of a thousand and five pounds; wherefore, for reversing the said judgment, and for recovering judgment against the said Benjamin Gay for restitution of the costs aforesaid, and for possession of the premises, demanded in the original writ, and for costs of court, he, the said Nathaniel Ames, brings this suit, as also for his costs occasioned thereby.

"This suit was commenced at August term last, when both parties appeared, and the case, after a full hearing, was committed to the jury, who were sworn, according to law, to try the same, and returned their verdict therein upon oath, that is to say, they find specially, viz. that the said Fisher Ames was seised of the remainder of the tenements aforesaid, expectant upon the death or marriage of the said Hannah Fisher, as set forth in the writ, and afterwards died so seised thereof and intestate, leaving neither wife nor child; and afterwards the said Hannah, the tenant for life, died seised of the said tenements, as set forth in the writ, that the said Nathaniel Ames was father of the said Fisher Ames, and the defendant's wife was his aunt; and if, upon the whole matter, the plaintiff, by force of the province law, is intituled to the premises, the jury find for the plaintiff reversion of the former judgment, possession of the premises demanded, and costs of court; but if not, they find for the defendant costs; and from thence the action was continued from term to term to this time, for the court's advisement on the special verdict; and now, after mature advisement thereon, and a full hearing of the parties by their counsel, it is considered by the court, that the former judgment be and hereby is reversed, and that the said Nathaniel Ames recover against the said Benjamin Gay the possession of the premises sued for, and costs of court, taxed at sixteen pounds, fifteen shillings and seven-pence, in bills of credit on this province of the new tenor. Fac. hab. possess. issued Nov. 24, 1749."

execution for the debts of the reversioner and remainder-man, and comprehended as "real estate" of the debtor under our statute of executions of 1783, c. 57. The cause of Whitney v. Whitney, 14 Mass. 88, is more in point. There the court held, that a reversion in the hands of a mesne reversioner was, on his death, to be considered as assets in the hands of his administrator for the payment of his debts, notwithstanding the tenancy for life did not expire until after his death. The reasoning of the court proceeds upon the admission of the doctrine of the common law; and that it had been changed by our statutes. If the reversion, notwithstanding the death of the party, before the life estate falls in, be assets, because it constitutes a part of the "real estate" of the mesne reversioner, it seems to me, that for the same reason, it must be liable to distribution among his heirs.

Upon the whole, my opinion on this question is, that the common law rule, as to descents of reversions and remainders, has been altered by our statutes, and is not in force here; and that, by our statutes, reversions and remainders, of which the intestate is the owner at the time of his death, are to be distributed among his heirs in the same manner as estates in possession. In Connecticut the same question has arisen under the statute of descents of that state, which contains provisions, in substance, like ours; and after very elaborate arguments, the court came to the same results, to which my own judgment has been led.

There is a point, which has been suggested at the argument, upon which it may be well to dwell for a moment, as it fortifies the conclusion already expressed by the court, and leads adverse to the right of the demandant to recover the third of the reversion, which devolved on his sister Mary. It is this, that as upon her death, her right in the reversion, by our statutes, descended to her father, and vested in him as a mesne reversioner, and as he was then tenant for life, by the curtesy, of the whole premises, he became by operation of law, to this third part, seised in fee by the union of both estates. In other words, his estate for life, as to this third part, became merged in the reversion in fee, which devolved upon him. Lord Coke puts (1 Inst. 182b) several analogous cases. "If (says he) a man maketh a lease to two for their lives, and after granteth the reversion to one of them, the jointure is severed, and the reversion is executed for the one moiety, and for the other moiety there is tenant for life, the reversion in the grantee." So, "if lessee for life granteth his estate to him in the reversion, and to a stranger, the jointure is severed, and the reversion executed for the one moiety by the act of law." If I may be allowed to state a fact within my personal knowledge, I would add, that at an early period of my professional life, I put this very inquiry to Mr. Chief Justice Dana, in order to ascertain if the common law rule had ever been recognised here. His answer was, that he knew no distinction admitted in descents here, between estates in possession and in reversion. I refer to this merely to show that his extensive learning and practice had not led him to notice the existence of any distinction in this state.

Judgment for plaintiff, two thirds of the premises.