## Thompson Miller *vs.* Seth Miller.

A reversion expectant upon the determination of an estate for life vests, by descent, in the heirs of the tenant in fee, upon his decease.

A married woman, seized of an estate in fee, died intestate in 1789, while *St.* 1783, *c.* 36, § 1, was in force, which entitled her oldest surviving son to two shares of her estate: Her husband rightfully held her estate after her death, as tenant by the curtesy, until his death, which was after January 1st 1790, when, by *St.* 1789, *c.* 2, the said provision of *St.* 1783 was repealed, and the real estate of persons dying intestate was made to descend in equal shares to their children. *Held,* that the fee of the intestate's real estate vested in her children, at her decease, in the proportions prescribed by *St.* 1783, *c.* 36, and that her oldest son, upon the death of the tenant by the curtesy, was entitled to two shares, and her other children to one share each.

Real estate descended, under *St.* 1783, *c.* 36, § 1, to three heirs, S., T. and M., two fourths to S., the oldest surviving son of the intestate, one fourth to T., and one fourth to M.: S. and T. gave a joint deed of quitclaim and release to M. of all their right and title to a certain part of the estate, described by metes and bounds, in consideration of $200, and also of M.'s deed of quitclaim and release to them of the residue of the estate; and M. at the same time gave to S. and T., jointly, a similar deed of the residue of the estate, in consideration of $200, and also of their said deed to M. *Held,* that M.'s deed did not release one eighth to S. and one eighth to T., but that they held the estate, thus released to them, in the same proportions in which they originally held it.

This was a petition for partition of several tracts of land in Middleborough and Rochester. The petitioner alleged that he was seized in fee of an undivided half of said tracts, as tenant in common with the respondent; and the case was submitted to the court on the agreed statement of facts which follows:

" The said Seth Miller and Thompson Miller are seized, in equal shares, of the two small lots of land set forth in said petition, which were formerly owned by Thomas Haskins. And as to all the residue of the lands and tenements in said petition mentioned and described, the following facts are agreed: Jacob Thompson, on the 5th of March 1775, conveyed in fee, by deed, to his daughter Abigail Miller, the mother of the petitioner and respondent, then the wife of· their father, Seth Miller, now deceased, two lots of land in Middleborough ; and on the 3d of April 1778, conveyed in fee, by deed, to the said Abigail Miller, three other lots of land in Middleborough, and a large tract of land in Rochester. By virtue of said deeds, said Seth and Abigail became seized in fee, in her right, of the lands set off, in the year 1830, to Elizabeth M. Shaw, wife of Soranus Shaw, as hereinafter stated, and all the lands and tenements described in said petition, except the two small pieces first mentioned in this statement.

" The said Abigail Miller had only three children, viz. Seth Miller, the respondent, the oldest son, Elizabeth Miller and the petitioner. Said Abigail died intestate, on the 22d of July 1789 ; all her said children being alive at the time of her death. Her said husband, Seth Miller, survived her, having, after her death, until his own .death — which was on the 6th of June 1823 — held the premises as tenant by the curtesy.

" The said Elizabeth Miller married Noah Alden, and died January 12th 1798, leaving two children, viz Abigail Alden and Elizabeth M. Alden. Said Abigail Alden died March 7th 1801, before she arrived at the age of twenty one years. The said Elizabeth M. Alden married Soranus Shaw, before the year 1828, and is now the wife of said Soranus. Before the year 1830, the said Elizabeth M. Shaw, wife of said Soranus, became seized, partly by descent and partly by purchase, of all that part of said estate to which her mother, Elizabeth Alden, was entitled at the time of her death, (if any ;) and on the 4th of February 1830, a portion of all the

lands and tenements conveyed to said Abigail Miller, as afore-
said, was set off to said Elizabeth M. Shaw; the said Seth
Miller and Thompson Miller releasing to her all their right
and interest therein, and the said Elizabeth M. Shaw, and
her husband, the said Soranus, releasing to the said Seth and
Thompson all their right and interest in and to all the lands
and tenements described in said petition, except the two lots
first mentioned in this statement. And the portion set off to
the said Elizabeth M. Shaw, as aforesaid, was one fourth
part of all the lands and tenements conveyed to said Abigail
Miller by Jacob Thompson, as aforesaid. The said Eliza-
beth M. Shaw and Soranus Shaw received one fourth of the
estate, conveyed as aforesaid by said Jacob Thompson to
said Abigail Miller, and the petitioner then expressly said, he
himself would not be bound by such a proportion. In set-
ting off the part to said Elizabeth M. Shaw, the surveyor,
attended by the respondent and the said Soranus Shaw, di-
vided the lands and tenements into four parts, by them con-
sidered to be equal in value, and the part set off to the said
Elizabeth M. fell to her by lot. The petitioner had no
agency in this operation, and when the release was presented
to him to sign, it was expressed to be a fourth part; but he
refused to sign it, and another release was written, in which
that expression was omitted, and he thereupon signed said
release. All the deeds and releases stated above are to be
used in the case.*

"The lands set off to said Elizabeth M. as aforesaid are not

---

* The deed of Elizabeth M. and Soranus Shaw to the petitioner and re-
spondent was thus: "Know all men by these presents, that we, Soranus
Shaw, of Bridgewater, and Elizabeth M. Shaw, wife of the said Soranus Shaw,
in her right, with the consent of the said Soranus testified by his being a party
to this deed, in consideration of two hundred dollars paid by Seth Miller of
Middleborough, and Thompson Miller of Boston, also in further consideration
of the remise, release and quitclaim of the said Seth Miller and Thompson
Miller of two lots of land, one lying in Rochester and the other in Middlebor-
ough aforesaid, to the aforesaid Elizabeth M. Shaw, the receipt whereof we do
hereby acknowledge, have hereby remised, released and forever quitclaimed,
and do, for ourselves and our heirs, remise, release and forever quitclaim unto
the said Seth Miller and Thompson Miller, their heirs and assigns forever, all

set forth or described in this petition; but partition is sought of the residue, and of the two lots first mentioned.

" It is agreed, upon these facts, to submit the matter of law to the whole court, who are to determine the several purparties of the petitioner and respondent, respectively, in the premises sought to be divided, and described in this petition, and to give judgment that partition be made accordingly."

*Eddy & T. Miller*, for the petitioner.   At the time when Abigail Miller died, the respondent was entitled to a double share of her estate, by *St.* 1783, *c.* 36, § 1 ; but at the time when his father died, that statutory provision was repealed by *St.* 1789, *c.* 2, and all her children were entitled to equal shares.

The descent was suspended during the continuance of the father's tenancy by the curtesy, and all the children took the estate, on his decease, according to the statute of 1789, which abrogated the right of primogeniture. Lit. § 394. Co. Lit. 241 *b.* Watkins on Descents, 65 – 67, 110 – 112. 4 Kent Com. (5th ed.) 386 – 389.   Sullivan on Land Titles, 153. *Jackson* v. *Hendricks*, 3 Johns. Cas. 214.   *Bates* v. *Shraeder*, 13 Johns. 260.   This seems to have been regarded as the law of Massachusetts, as well as of England and New York.   See *Sheffield* v. *Lovering*, 12 Mass. 490.   *Whitney* v. *Whitney*, 14 Mass. 88.   The *St.* of 1783, *c.* 36, did not direct when the descent should operate.

If, however, the petitioner cannot maintain his claim to a moiety of the lands of which the respondent claims two thirds, he is entitled at least to three eighths, by virtue of the

right, title and interest which the said Elizabeth M. Shaw has, in her right, in and to."   [Here the released premises were fully described by metes and bounds.]   " To have and to hold the aforementioned premises, with all the privileges and appurtenances thereunto belonging, to the said Seth Miller and Thompson Miller, their heirs and assigns forever," &c.

" Soranus Shaw. (Seal.)

Elizabeth M. Shaw. (Seal.) "

The deed of Seth Miller and Thompson Miller to Elizabeth M Shaw was in the same form, and on the same recited considerations, *mutatis mutandis.*

deed of Elizabeth M. Shaw, the legal effect of which was, to convey one eighth to the petitioner, and one eighth to the respondent, in addition to the fractional parts previously owned by them.

*W. Baylies & S. Miller*, for the respondent. On the death of Abigail Miller, the reversion descended according to *St.* 1783, *c.* 36, (a double portion to Seth,) and vested in the heirs. 2 Bl. Com. 175. 4 Dane Ab. 790. Cruise's Digest, tit. 5, *c.* 2, § 23 ; tit. 17, § 13. *Williams* v. *Amory*, and *Whitney* v. *Whitney*, 14 Mass. 20, 88.

The law contended for by the petitioner was altered by the early statutes of Massachusetts. *Sheffield* v. *Lovering*, 12 Mass. 490. And the case of *Cook* v. *Hammond*, 4 Mason, 467, which was recognized in *Russell* v. *Hoar*, 3 Met. 187, is conclusive against his claim. Even the English doctrine of suspending descents is not applicable to the case at bar. That doctrine applies only to the matter of *possessio fratris*, to prevent a descent to the half blood. Watkins on Descents, *c.* 3, § 2. 2 Wooddeson, 253, & *seq.*

Shaw, C. J. This is a petition for partition, in which the petitioner claims one half of the described premises. This claim is admitted as to two small parcels, but as to the residue, constituting the largest proportion of the premises, the respondent contests the claim of the petitioner to one half, and insists that he is entitled to a third only.

The parties claim by descent from their mother, Abigail Miller, who was seized in fee, and died in July 1789. She left her husband, Seth Miller, surviving her, who was entitled to the estate for his life, as tenant by the curtesy, and who died in 1823. Mrs. Abigail Miller left three children her heirs, namely, the present petitioner and respondent, and one daughter Elizabeth Miller, who married Noah Alden, and died in the life time of her father, leaving one daughter, Elizabeth M. Alden, who still survives, having married Soranus Shaw.

The court are of opinion that the rights of these parties, in respect to the proportions which they may legally take, are

not affected by the transaction stated in the facts, by which Mrs. Shaw, their niece, transferred her share to them. It was a partition and mere release of her share and interest to them, in one portion of the common estate, in consideration of their release to her of their interests in the other portion assigned to her. But they held in the same proportions which they originally had, whether that was in equal shares, or whether the elder brother had two shares. And we place no reliance on the fact that the petitioner joined in this partition. We think he waived no right by it.

But the main point of controversy is this: The respondent, as the eldest son, claims two shares of the inheritance, to each of the other heirs' one share. This claim is denied by the petitioner, and it depends on the question upon what rule of law the rights of these parties rest. By *St.* 1783, *c.* 36, § 1, it was provided that land should descend equally among children, and such as legally represent them; except that the eldest son should have two shares. This exception was abrogated by *St.* 1789, *c.* 2, which went into operation on the 1st of January 1790 ; and from and after that time, all children took in equal shares, without regard to sex or primogeniture. Mrs. Abigail Miller, the mother of the parties, from whom the estate descended, died in July 1789, before the new law took effect. If the law, as it then stood, governs the descent, and regulates the rights of the parties, the respondent is clearly entitled to two shares.

But the petitioner insists, that as the right to this inheritance was suspended by the intervention of an estate for life in the tenant by the curtesy, the proportions in which the heirs are to take must be governed by the law as it stood at the determination of the particular estate. The court, however, are all of opinion that this position cannot be maintained. The estate of the mother was an estate in fee, subject to an inchoate tenancy by the curtesy, in the husband, after the birth of children, which became consummate, as an estate for life, at her decease. Whether regarded as a present estate subject to a charge or incumbrance, or as a reversion, it vested in the heirs, at the time of the decease of the

Miller *v.* Miller.

mother, and their rights were fixed by the law, as it then stood. This precise point was decided in the case of *Cook* v. *Hammond,* 4 Mason, 467 ; and although another question was very much controverted in that case, and many authorities were cited, it was not even questioned that the estate vested, at the time of the descent cast, at the° decease of her from whom the inheritance came, and that the shares of the heirs must be determined by the law as it then stood.

At the time of the decease of Mrs. Miller, who was the owner of the estate in fee simple, she left three children, two sons and a daughter. The law then in force, *St.* 1783, c. 36, $ 1, declares, in terms, that " when any person shall die seized of lands, tenements or hereditaments, not by him devised, the same shall descend in equal shares to and among his children," &c. " except the eldest son then surviving, who shall have two shares." Another clause, $ 5, secures to the husband of the deceased the estate for his life, as tenant by the curtesy. All these estates vested at the same time, and together exhausted the whole fee simple estate. Of course the reversion was, by force of this enactment, divided into four shares, of which the eldest son took two, and the daughter and younger son, one each.

In opposition to this result it was contended, at the argument, that by the common rule of descent in force in this Commonwealth, when a life estate intervenes between the death of the owner last seized, and the commencement of the right of the reversioner, the vesting in actual enjoyment is suspended, and then none can take, at the termination of the life estate, except those who can make themselves heirs to the person last actually seized. But the court are of opinion, 1st, that if this rule prevailed in this Commonwealth, it would not affect the question ; and 2d, that this rule does not prevail here, but has been changed by the colonial, provincial and state statutes, and the constructions put upon them by the courts of justice.

We think this rule, where it prevails, does not prevent the estate from being vested. It merely determines that,

when the particular estate terminates, those only can enter upon the possession and enjoyment of the estate, who can make themselves heirs to him who was last actually seized, and at whose death the particular estate commenced ; that is, that although the remainder or reversion vested in an heir, who has himself deceased, leaving heirs, the estate shall go to him only who is heir of the first purchaser, and not to the heir of a mesne reversioner, who is not of the blood of the first purchaser, if the mesne reversioner happens to have heirs who are not heirs of the first purchaser. The foundation of the rule is, that to make one a stock or root of inheritance, a right or seizin in law is not sufficient, but there must be an actual seizin — a seizin accompanied by an actual possession or a *possessio fratris* — to constitute such stock. But this is taken with many qualifications not necessary to be specified. It is manifest, however, that this rule, where it exists, does not prevent the estate from vesting. This appears from various considerations. The reversioner may have waste against the tenant in dower or tenant by the curtesy, and upon waste proved, may be put into immediate possession. Such reversioner may alienate his interest or mortgage it, or charge it with his specialty debts. It is therefore an estate, an interest in the land, obtained by the inheritance, by the descent cast, and by force of the rules of law operating upon and giving effect to that event ; and though it is enlarged and perfected, and discharged from a burden, on the death of the tenant for life, it does not then originate, nor derive its character from the law then in force.

But even if the vesting of the estate were suspended, until the happening of any event, when the event does happen, the right by descent must depend upon the law, as it stood when the descent was cast. Suppose an estate was granted sixty years ago, in 1785, upon a condition subsequent, and the grantee died the year following ; and now the event happens upon which the estate, by force of the condition, is defeated, and the heirs of the grantor become entitled to enter ; and the question is, who are his heirs ? Would it not be those who

were the heirs of the donor at the time of his decease, in 1786 ? The benefit of the condition, the *scintilla juris,* then vested in them, viz. the right to enter for condition broken; and whether the condition were broken before or after the change of the law, 1st of January 1790, the same persons would be heirs, constituted so by law, taking in the proportions fixed by that law when they became heirs.

In the present case, it is manifest that whether the rule of law alluded to is in force in this Commonwealth or not, it would make no difference as to the persons who would inherit. Mrs. Alden, the daughter, died during the continuance of the life estate, leaving one daughter, Mrs. Shaw, as her heir at law, who yet survives. Mrs. Shaw was heir as well to her grandmother as to her mother. She could claim as heir to the person last seized ; and whether her mother or her grandmother be considered the root of the inheritance. Had she died, living her father, who, by force of the statute would be her heir, but not of the blood of the person last seized, it would have raised the question.

But as I have already stated, this is, perhaps, not material, because the question in this case is, not who is to take, but in what proportions, and under what law. .

But we are of opinion that the rule in question is not in force in this Commonwealth. By our statutes, all real estate, including a vested remainder or reversion, is an inheritable estate. A vested remainder is liable for the owner's debts, may be alienated, and if not alienated will descend to his heirs. *Ames* v. *Gay,* 4 Mason, 492, *note. Williams* v. *Amory,* and *Whitney* v. *Whitney,* 14 Mass. 20, 88. *Russell* v. *Hoar,* 3 Met 187. But this subject is so fully discussed and exhausted by the arguments of counsel and the elaborate opinion of the court, in the case of *Cook* v. *Hammond,* 4 Mason, 467, that I have not thought it necessary to go particularly into the grounds of the judgment on this point.