Wilde, J.,
delivered the opinion of the Court. On the statement of facts in this case, it has been argued by the counsel for the defendant, that, by the will of Samuel Whitney, his widow took an estate for life, determinable on her second marriage, and his heirs a * remainder in fee, which not depending on a contingency, vested in them at his death; and that Joseph Whitney's share thereof is assets in the hands of his administrator.
On the other hand, it has been argued for the plaintiff, that the devise over to the heirs is void; and that the share of the estate in controversy descended to the plaintiff, at the death of the widow, as heir to his grandfather, and is not, therefore, to be charged with the payment of his father’s debts.
If the devise over to the heirs can be supported, there can be no doubt that, on the death of the testator, a remainder in fee vested in Joseph Whitney, which would be assets in the hands of his administrator. For in such case, the plaintiff must claim as heir to Joseph; and his title might be defeated by the administrator’s sale *81 of the estate, the claim of the creditors being paramount to that of the heirs.
But on examining the books, it appears clearly that the devise to the heirs cannot be supported. The rule of law is, that a person cannot raise a fee to his own right heirs, by the name of heirs, as a purchase, unless he parts with his whole estate. So, if he makes a devise to them, without changing the tenure of the lands, although he charge them with debts or other encumbrances, yet the heirs shall take by descent. Or if, after several mesne estates, he should limit the ultimate remainder to his own right heirs, the remainder would be void, and the reversion would descend as if no limitation over had been made. For whether they should take a remainder or reversion, they would have an absolute fee, after the termination of the mesne estates ; and the title by descent is, in estimation of law, the worthier title. (3)
Upon these principles, Joseph Whitney, on the death of his father, took a reversion in his estate ; and the only remaining question to be considered is, whether such reversion be liable to the. r >yment of his debts in the hands of his administrator.
It is a well-settled principle of law, that there can be *no mesne seisin of a remainder or reversion expectant on an estate of freehold, so as to make a possessio fratris, by the law of England; or to enable the mesne remainder-man or reversioner to transmit the estate to his heirs as an inhe xtance. It is true, such descent may be turned by the grant or othe disposition of the remainder or x-eversion, by the mesne remainder-man or reversioner. So, if a mesne reversioner binds himself and his heirs in an obligation, axxd dies leaving the tenant for life, the reversion will be assets, or quasi assets, in the hands of the heir; and a creditor may have judgment, quando acciderint. Or if judgment be had against a mesne reversioner in his lifetime, it will bind the property, although no execution be taken out until the property descend to others; such acts of ownership and charges on the re - version being considered as equivalent to the actual seisin of an estate, which is capable of being reduced to possession by entry. (4)
But if no such acts of ownership be exerted, or no such charges be made, the reversion or remainder will continue to devolve, on the death of each particular heir, to the next heir of the donor, or the remainder-man, as the case may be, until the determination of the particular estate ; when it will vest in possession in him who is then the right heir of the donor, or original remainder-man. And *82 the person taking such reversion or remainder will hold it free from the debts of the mesne reversioner or remainder-man, as he would not inherit from him, but from the original donor.
Upon these principles of the common law, the plaintiff must be considered as inheriting the estate in question, as heir to his grandfather ; the same not being assets for the payment of the debts of his father, the mesne reversioner.
It remains to be considered, whether these principles have been changed by statute.
At an early period of our colonial government, we find that lands and houses were made liable to the payment of debts: since which period, both before and after * the revolution, several acts in pari materia have been passed, the general policy of which seems to be, to charge the whole of a man’s estate with the payment of his debts; and this policy, founded in manifest justice, ought to be enforced in this case, if the several laws in the statute-book, or any one of them, will admit of a reasonable construction to this effect.
By the statute of 1783, c. 36, § 3, it is enacted, “ that the real estate ” of deceased debtors “ shall stand chargeable with all the debts of the deceased, over and above what the personal shall be sufficient to pay.” And by the statute of 1784, c. 2, for the distribution of insolvent estates, provision is made that the estates of insolvent debtors, both real and personal, shall be distributed among their creditors.
It is true that, strictly speaking, reversions and remainders are not real estate; yet they are sometimes so considered; for by a grant of land a reversion will pass ; and if so, then the administrator, by making sale of the land, may well pass the reversion. According to common intendment, real estate includes every thing not personal; and such is doubtless the meaning of these statutes. By the terms real and personal estate, the legislature must be understood as intending to comprise a man’s whole property. A similar intention is manifested by the statute of 1805, c. 90, § 5, whereby all the lands, tenements, and. hereditaments, of a deceased debtor are made liable to the payment of his debts. Now, a hereditament includes whatever may be inherited, be it corporeal or incorporeal, real, personal, or mixed; and although it may not comprise, in a legal sense, reversions and remainders, yet the legislature, in making use of a term thus comprehensive, have sufficiently expressed an intention of charging the whole estate And we can see no good reason why we should not give a construction to these statutes conformable to such an intention.
The language of a statute is not to be construed according to *83 technical rules, unless such be the apparent meaning of the legislature. Therefore many cases, * not expressly named, may be comprehended within the equity of a statute ; the letter of which may be enlarged or restrained, according to the true intent of the makers of the law.
On the whole, we are of opinion that the reversion in question is by law chargeable with the debts of Joseph Whitney, the mesne reversioner, and that the plaintiff, according to the stipulation of the parties, must be called.

Plaintiff nonsuit, 

(a)

 Co. Lit. 22, h — Watkyns on Descents, 280, 259.

 Watk. 137, 110, 141. — 2 Cruise’s Digest, tit. Reversion, § 20, 24.— Carth. 129 — Lutw. 503.

 [The intention of the legislature must, in all cases, be ascertained oy the words of the act. Though the judges, in interpreting the law, (says Mr. Dwarris,) are to explore the intentions of the legislature, yet the construction to be put upon an act of Parliament must be such as is warranted by, or at least not repugnant to, the words of the act. Where the object of the legislature is plain and unequivocal, courts ought to adopt such a construction as will best effectuate the intentions of the lawgiver. But they must not, in order to give effect to what they may suppose to be the intention of the legislature, put upon the provision of a statute a construction not supported by the words, though the consequence should be to defeat the object of the act. — Rex vs. Stoke Damerel, 7 B. & C. 569.— Where the legislature has used words of a plain and definite import, it would be dangerous to put upon them a construction which would amount to holding that the legislature did not mean what it has expressed. The fittest course, in afl cases where the intention of the legislature is brought in question, is to adhere to the words of the statute, construing them according to their nature and import, in the order in which they stand in the act. —Rex vs. Ramsgate, 6 B. & C. 712. — The most enlightened and experienced judges have for some time lamented the too frequent departure from the plain and obvious meaning of the words of the act by which a case is governed, and themselves hold it much the safer course to adhere to the words of the statute construed in their ordinary import, than to enter into any inquiry as to the supposed intention of the parties who framed the act. — Rex vs. The Inhabitants of Great Bentley, 10 B. & C. 527. — They are not to presume the intentions of the legislature, but to collect them from the words of the act; and they have nothing to do with the policy of the law. This is the true sense in which it is so often impressively repeated that judges are not to be encouraged to direct their conduct “ by the crooked cord of discretion, but by the golden metwand of the law,” i. e., not to construe statutes by equity, but to collect the sense of the legislature by a sound interpretation of its language, according to reason and grammatical correctness. —2 Dwar. 703. —“ Our decision,” said Lord Tentcrden, in a late case, “ may perhaps operate to defeat the object of the statute, but it is better to abide by this consequence than to put upon it a construction not warranted by the words of the act, in order to give effect to what we may suppose to be the intention of the legislature.” — Rex vs. Barkar, 8 B. & C. 104. — In another case, the same learned judge said, “ The words may probably go beyond the intention) but if they do, it rests with, the legislature to make an alter ation: the duty of the court is only to construe and give effect to the provision.” — Nottey vs. Buck, 8 B. & C. 164. — “ It is safer,” said Mr. J. Ashurst, “to adopt what the legislature have actually said, than to suppose what they meant to say.” — 1 T.R. 52. — “ We can only say of the legislature,” said Lord EUenborough in a particular case, “ Quod voluit non dixit”— 6 East, 518. — See, too, Rex vs. Turvey, 2 B. & A. 522. — Rex vs. Bray, 3 M. & S. 20. — In Branding vs. Barrington, (6 B. & C. 475,) Lord Tentcrden said, “ It is said it was within the equity of the statute; speaKing for myself alone, 1 cannot forbear observing that I think there is always danger in giving effect to what is called the equity of a statute ; and that it is much safer and better to rely on and abide by the plain words, although the legislature might possibly have provided for other cases, had their attention been directed to them.” A casus omissus can in no case be supplied by a court of law; for that would be to make laws. Judges are bcnnd to take the act as the legislature have made it.” — 2 Dwar. 711. — En.]