### JOHN HOLLAND vs. EDWARD CRUFT, Administrator, & others.

A statute, incorporating the tenants in common of a wharf, their heirs and assigns, upon their own petition, for the purpose of enabling them the better to manage and improve the same, does not transfer the title in the wharf to the corporation.

Lands purchased by such a corporation, for the improvement of their wharf, vest in fee in the corporation, to the use of all the proprietors, in proportion to their shares of the undivided estate; and such interest of each proprietor in land so purchased is annexed to his estate in fee in the wharf, and will pass by a devise of all his right in the wharf, though executed before such purchase, and before the Rev. Sts. took effect.

Where real estate, specifically devised by a will which authorizes the executor or administrator to sell any of the testator's real estate and reinvest the proceeds in personal estate, but does not manifest any intent thereby to alter the disposition of the property, is otherwise legally converted into personalty, the proceeds are to go to the same persons and in the same proportions as if it had remained real estate.

The St. of 1791, c. 60, § 2, making estates tail "subject to the payment of the debts of the tenant in tail, in the same manner as other real estates," did not make a remainder in tail liable to the debts of the remainderman.

A decree, in a suit in equity of a widow against the administrator and children of her husband, ordering money received on the sale of real estate devised to her for life, with remainders in tail to the children, to be invested and the income paid to her for life, and at her decease the principal " to be distributed by the said judge of probate among the children of said [testator] or their legal representatives, agreeably to the tenor of the will aforesaid," is no bar to an action by the eldest son of one of the children, 'on the death of the widow, claiming his share of the proceeds as tenant in tail.

BILL IN EQUITY, filed on the 5th of November 1850, by the only son and male heir of Samuel May Holland, a son of John Holland, the elder, to recover of Edward Cruft one fifth of a sum of money in his hands as administrator with the will annexed of said John Holland. The other defendants were Laura P. Holland, widow and administratrix of Samuel May Holland, the three daughters of said Samuel, and Aaron D. Weld, who claimed under an assignment made by said Samuel on the 9th of May 1827, which was held fraudulent and void as against creditors in *Holland* v. *Cruft*, 20 Pick. 321. The parties sub-

mitted the case to the decision of the court upon an agreed statement of facts, in substance as follows :

On the 23d of August 1822, John Holland, the elder, duly executed his last will and testament, containing the following provisions: " I give to my wife, Sarah Holland, during her natura. life, all my mansion-house and appurtenances, with the furniture and stores, as the same shall remain at my decease; and my pew in the Federal Street Meeting-house; also the income and profits of my right in the Boston Pier or Long Wharf, being one full share of the same, *i. e.* three warehouses and one twenty-fourth part of said wharf; and at her decease the said mansion-house, with the remainder of the furniture and stores, if any, the pew, and also the said right, to be divided among my children, Samuel May, Sarah May, George Washington, Catharine Cravath and Frederic West, share and share alike, and to the heirs of their bodies respectively."

" I recommend to my executor that, as soon after my decease as he shall think it expedient, my just debts and funeral charges being paid, he sell all the shipping and other estate, real or personal, of which I shall die seized, and having converted the same into money, that he vest the same in public stocks or other secure and permanent funds, as he shall judge most safe and productive.  And should said executor, or any administrator with this will annexed, see fit to sell any of my real estate according to this recommendation, in such case I do hereby authorize him to make sale thereof, and to convey the same by deed or deeds, without applying to any court for leave therefor."

On the 18th of June 1824, the testator died, leaving his five children in full life; and his will was duly proved on the 28th of said June.

The said John Holland, at his decease, as well as at the time of the execution of said will, was the owner in severalty of three warehouses on said wharf, and was also the owner of one undivided twenty-fourth part of said pier or Long Wharf, that is, of one full share in the propriety.  The tenure of property in the Boston Pier or Long Wharf was as follows :  In the year 1715 the then owners of the same divided the same into twenty four

shares, and by a common deed of indenture, into which they all entered, warranted to each proprietor his share as therein allotted; and the proprietor of each share, then or sometime afterwards, became entitled to two warehouses in severalty above the T, and one warehouse below the T.

In the year 1772, upon the petition of said proprietors, the general court of the Province of Massachusetts passed "an act for incorporating the proprietors of Boston Pier, otherwise called the Long Wharf, in the Town of Boston," (Mass. Perpet. Laws, 611,) the preamble and first section of which are copied in the margin.*

* Whereas the Proprietors of the Boston Pier, otherwise called the Long Wharf in the town of Boston, have by their petition, preferred to the great and general court in their present session, set forth that in the year 1715 the said wharf was by deed, under the hands and seals of the then proprietors, divided into twenty four shares, in which deed it was, among other things, agreed to keep the said wharf in good and sufficient repair; and that, if any particular proprietor should neglect or refuse to repair their respective parts, it should be done by the proprietors' committee, and the cost and charge be deducted out of such particular proprietor's share of the common wharfage; and that by said deed they warranted to each proprietor his share as then allotted, " so nevertheless as always to be and continue subject to the rules and regulations for the management and improvement of the whole wharf or pier, and upholding the same in good order and repair, and in such method and manner as are already, or shall further be agreed upon by the major part of the proprietors, and entered in their book; that, in consequence of such agreement, the said pier or wharf has been kept in repair by the income thereof ever since; but that within a few years past it was greatly gone to decay, and in danger of being utterly lost; whereupon the proprietors agreed to build a stone head, further out towards the channel, in order to secure the whole interest, which they have in a great measure effected, the said head still lying in common and undivided; but that the cost and charge of such work will amount to much more than the income of said wharf will defray or reimburse in many years to come; and that, in consideration of the premises, the proprietors of the said wharf did, at a meeting duly warned on the 29th of April 1772, at which meeting the proprietors of seventeen shares and three quarters were present, unanimously appoint a committee to prepare and prefer a petition to the great and general court, praying that they may be incorporated, in order more effectually to transact the business of the propriety, and empowered to subject the respective interests of the several proprietors, when it shall be found necessary, for defraying the charges of additions or repairs which have been or hereafter may be voted and ordered at any legal meeting:

Said shares and also said warehouses have from time to time been conveyed by the individual proprietors thereof, by their individual deeds, duly executed and recorded in the registry of deeds; and this is the only mode in which sales or voluntary transfers thereof have been made; and the interest of each proprietor has been uniformly considered and treated by said proprietors as real estate.

By *St.* 1806, *c.* 11, said proprietors were authorized to purchase and hold, in their corporate name, certain real estate adjoining the wharf on the south, to the value of $50,000; and by *St.* 1824, *c.* 2, they were authorized to purchase additional real estate to the amount of $100,000.

On the 30th of November 1822, (after the date of John Holland's will, but before his decease,) the said proprietors in their corporate name purchased and took deeds of five sixths of Spear's Wharf; in July and August 1824, the remaining one sixth, and a house and land on Spear's Wharf, not included in their previous purchases; and on the 17th of June 1824, Bray's Wharf, which adjoined Spear's Wharf.

On the 9th of December 1824, and the 25th of February 1825, said proprietors sold and conveyed to the City of Boston, for the sum of $105,000, portions of Spear's Wharf and Bray's Wharf, by indentures duly executed in their corporate name.

Be it therefore enacted by the governor, council and house of representatives, That the Proprietors of the Boston Pier, otherwise called the Long Wharf in Boston, be created, made, erected and incorporated into a body politic for the purposes hereafter mentioned, by the name of the Proprietors of Boston Pier or the Long Wharf in the town of Boston in New England; and that they, their heirs and assigns, have a perpetual succession by the said name, and by that name may sue or be impleaded, and manage, lease, bargain, sell or otherwise dispose of such part of the said propriety, whether divided or undivided, as shall be found necessary for defraying the cost of such additions or repairs as have been already voted and ordered, or hereafter may be voted and ordered, at any meeting of the proprietors, duly warned for transacting the business of the propriety: Provided, that no part of the said interest shall be sold, unless the income of the said wharf shall be deemed insufficient, within the course of the then current year, to defray the cost of the work that may have been by the proprietors voted and ordered to be carried on and effected.

By a vote of their standing committee, who had the general direction and care of their affairs, a certain proportion of the money received from the City of Boston for this purchase was distributed among the several shares in said propriety, and in pursuance thereof Cruft, as administrator, received on the share of John Holland, his intestate, the following sums, at the following times : April 1825, $3,000; April 1826, $1,716.67 ; May 1827, $800.

At March term 1826 and November term 1826 of this court, suits in equity were instituted by Sarah Holland, the widow of John, against Elijah Loring, clerk of said proprietors, the said administrator, and the children of said John Holland, claiming the principal of said sums of $3,000 and $1,716.67 under the will of her husband; and in those suits decrees were entered that said sums, and any further sum that might be received on said John Holland's share, under the contract with the City of Boston, should be paid by Loring to Cruft as such administrator, and be by him deposited with the Massachusetts Hospital Life Insurance Company in trust, and the annual income thereof paid to Sarah Holland during her natural life, and at her decease the principal to be paid over to any administrator of John Holland, or, in case there should be no such administrator, to such trustee as might be appointed by the judge of probate for this county, " to be distributed by the said judge of probate among the children of said John Holland or their legal representatives, agreeably to the tenor of the will aforesaid."

On the 2d of March 1826, an act was passed authorizing said proprietors to hold their wharf and lands in their corporate capacity. *St.* 1825, *c.* 117. The proprietors have never transferred their several interests, nor the property held in common by them, to the corporation, unless by the acts and doings of the proprietors and the corporation set forth in this statement; and they have never availed themselves of the *St.* of 1825, further than to choose a president and directors annually, instead of a standing committee.

In 1837, the proprietors, by deed duly executed in their corporate name, conveyed to the United States, for a custom-house,

land which belonged to them before the time of the execution of John Holland's will; and Cruft, as administrator, received from the clerk of the proprietors $3,750, as the proportion belonging to the share of John Holland's estate.  This sum, as well as the sums previously received by him, was deposited with the Massachusetts Hospital Life Insurance Company, the interest being made payable to Sarah Holland, and actually paid to her during her life.  The other sums were so deposited before the 9th of May 1827, and the sum of $3,750 in 1837.

Samuel M. Holland died insolvent in January 1833 ; and his debts, remaining unpaid, exceed the amount claimed by the plaintiff.  Sarah Holland, the widow of John, died on the 12th of July 1849, and at her death the principal sums, invested by Cruft as aforesaid, were paid over to him, and a balance thereof, amounting to more than $9,000, now remains in his hands, as appears by his last account, as allowed by the probate court, one fifth part of which is claimed by the plaintiff.  If it be material to ascertain what portion of the sum of $105,000, received from the City of Boston, was for lands or rights owned by the proprietors previously to the execution of the will of John Holland, or to his decease, it is to be determined in such manner as the court shall direct.

The arguments were had at November term 1853.

*C. P. Curtis & E. Merwin,* for the plaintiff.

*S. E. Sewall & G. S. Hale,* for the defendants.  1. Samuel May Holland's interest in the Long Wharf stock or propriety, at least in the land purchased under *Sts.* 1806 and 1824, was personal estate, and under the will vested absolutely in him. The corporation, by conveying both their original and after purchased lands in fee, and controlling the proceeds of sales, have practically construed their charter and subsequent statutes as vesting both in the corporation ; and any acts and conveyances necessary to vest in the corporation the real estate originally owned by the proprietors may be presumed.  The corporation was seized in fee of the lands purchased by them, and had the entire control of them ; the only right of the shareholders, who contributed the purchase money, was to an

aliquot part of the income or proceeds of sales. Where a corporation is seized of real estate in its own right, with the power of selling it and of substituting other property in its place, without regard to individual members, so that a shareholder has a right only to an aliquot portion of the shifting property, and to a dividend of the profits or proceeds of the principal, his interest is personalty. Especially is this so, where the real estate is obtained with funds, contributed by the members, which the corporation may invest and change. Angell & Ames on Corp. §§ 557, 559. 1 Cruise Dig. (Greenl. ed.) tit. 1, § 3, *&* note. *Russell* v. *Temple,* 3 Dane Ab. 108. *Arnold* v. *Ruggles,* 1 R. I. 165. *Bligh* v. *Brent,* 2 Y. & Col. Exch. 268. *Bradley* v. *Holdsworth,* 3 M. & W. 422. *Buckeridge* v. *Ingram,* 2 Ves. Jr. (Amer. ed.) 652 *&* note. Sullivan on Land Titles, 71. 1 Hilliard on Real Property, (2d ed.) 73. Words which would give an estate tail in realty vest an absolute interest in personalty. 2 Jarman on Wills, (Amer. ed.) 489. *Adams* v. *Cruft,* 14 Pick. 16.

2. If the interest of John Holland in lands purchased by the corporation after the date of his will was real estate, it was not affected by his will, and descended to his heirs. 1 Jarman on Wills, (Amer. ed.) 43 *&* notes. *Norris* v. *Harrison,* 2 Madd. 268. There was not here, as in the New River (2 P. W. 127) or Avon Navigation, (2 Ves. Jr. 652,) an interest in real estate before any land was acquired. 1 Hilliard on Real Property, (2d ed.) 49, and cases cited. The right of the corporation to buy was a mere possibility; the statutes merely gave the same right, which an individual always has, to purchase real estate; and a right to a share in Long Wharf, at the death of John Holland, no more included future acquisitions than a devise of " all my real estate."

3. Samuel May Holland's interest in the property sold before his death, if then real estate, was converted into personalty and passed to his administratrix. When a change has been legally effected in the nature of property by competent authority, it is a change for all purposes, and the property will be governed in its descent, distribution and liabilities by the rules incident to its new

character.  *Emerson* v. *Cutler*, 14 Pick. 108.  *Kent* v. *County Commissioners*, 10 Pick. 521.  *Grider* v. *M' Clay*, 11 S. & R. 224.  *Ex parte Hawkins*, 13 Sim. 569.  *Flanagan* v. *Flanagan*, cited in 1 Bro. C. C. 500.  *Oxenden* v. *Compton*, 2 Ves. Jr. 69, 264.  *Farrar* v. *Winterton*, 5 Beav. 1.  *Inwood* v. *Twyne*, 2 Eden, 154.  *Tullit* v. *Tullit*, Amb. 370.  *Fletcher* v. *Ashburner*, 1 Bro. C. C. 497. *Banks* v. *Scott*, 5 Madd. 493.  *Adams* v. *Cruft*, 14 Pick. 16. Leigh & Dalzell on Conversion, 90, 137, 164–168, 190, 191. When John Holland died, his share in the wharf was in the power of the corporation, and might be by them converted into personalty at any time; and the devisees took subject to this power.  The case is analogous to that of a contract to sell at the option of the buyer within a limited time, where, if the vendor dies before the option is exercised, a conversion of the property, by exercise of the option, relates back to the time of the agreement.  Leigh & Dalzell on Conversion, 19, 137.  *Kerr* v. *Day*, 14 Penn. State Rep. 112, and cases cited.

4. If Samuel May Holland's interest in the Long Wharf stock or propriety was real estate and a remainder in tail, it was subject to the payment of his debts, both before and after his decease.  Section 2 of *St.* 1791, *c.* 60, which is broader in its terms than § 1, providing for the conveyance of estates tail, enacts that " all lands, tenements or hereditaments, held in fee tail, shall be liable and subject to the payment of the debts of the tenant in tail, in the same way and manner as other real estates."  It has always been the policy of our law to subject real estate to the payment of debts, even where the debtor could not convey it, as in this case.  *Whitney* v. *Whitney*, 14 Mass. 91. *Leverett* v. *Armstrong*, 15 Mass. 28.  Rev. Sts. *c.* 73, § 1. Even in England, the *St.* of Westm. 2 was passed before the *St.* of *Quia emptores*.  2 Bl. Com. 289.  Estates tail have not been favored here.  The words " lands, tenements and hereditaments," especially in the statutes of Massachusetts for subjecting real estate to debts, include remainders; the word " held " is equivalent to owned; and the words " in the same way and manner as other real estates," show that all real estate was included.  *Williams* v. *Amory*, 14 Mass. 20.  *Whitney* v

*Whitney*, 14 Mass. 88. *Ellis* v. *Welch*, 6 Mass. 251. *Williams* v. *Hichborn*, 4 Mass. 189. *Cook* v. *Hammond*, 4 Mason, 488. Rev. Sts. *c.* 7, § 10, *cl.* 8; *c.* 23, §§ 33, 35; *c.* 43, § 1; *c.* 73, §§ 9, 10; *c.* 103, § 1; *c.* 115, §§ 1, 12. *Sts.* 1818, *c.* 96; 1783, *c.* 57, §§ 2–4. *Marshall* v. *Crehore*, 13 Met. 465. *Hunnewell* v. *Taylor*, 6 Cush. 472. *Fletcher* v. *Peck*, 6 Cranch, 147. *Van Rensselaer* v. *Kearney*, 11 How. 297. *Vanderheyden* v. *Crandall*, 2 Denio, 9, and 1 Comst. 491. *Van Rensselaer* v. *Poucher*, 5 Denio, 39. The Rev. Sts. *c.* 60, § 29, have changed the law, by expressly providing that this liability " shall not extend to lands in which the debtor has only an estate tail in remainder," which would not have been necessary if such was the law already. The only reason given by the commissioners, in their note to this section, for their opinion that this was the effect of *St.* 1791, is that, " as the tenant cannot by his own deed convey an estate tail to which he is entitled in remainder, he should' not be permitted to effect the same thing indirectly." But a tenant in tail in remainder could levy a fine, which by the express words of *St.* 32 H. 8, *c.* 36, § 1, would bar his heirs. And the commissioners themselves, in Rev. Sts. *c.* 73, §§ 1, 2, allowed rights of entry, which could not be conveyed, to be taken on execution.

These funds then are held by Cruft in trust for the administratrix of Samuel May Holland, and are assets, not excepting proceeds of sales after his death, as his estate was insolvent, and it would therefore have been her duty to sell under license. *Holland* v. *Cruft*, 20 Pick. 321. *Buttrick* v. ·*King*, 7 Met. 20. *Brazer* v. *Dean*, 15 Mass. 183. Or, if any technical difficulty exist, the court will distribute the funds as equitable assets. *Moses* v. *Murgatroyd*, 1 Johns. Ch. 119. *Cox* v. *McBurney*, 2 Sandf. 561.

5. The decrees of 1826 are an estoppel on the plaintiff, so far as concerns the sums mentioned in those decrees; for they order a distribution by the judge of probate, so that this court has no jurisdiction of this suit; and they decree distribution among the children or their " legal representatives," which must mean their executors or administrators, for, although these words have been otherwise construed in wills, in order to conform to the

intention of the testator, such latitude of construction is not allowable in decrees, in which courts must be held to use terms in their exact technical meaning. 2 Jarman on Wills. (Amer. ed.) 39, and cases cited. *Pillow* v. *Hardeman*, 1 Humph. 538, and cases cited. *Massachusetts Bank* v. *Oliver*, 10 Cush. 557. And the word " distribute " shows that the court intended the property to go as personalty. *Grider* v. *M' Clay*, 11 S. & R. 224.

SHAW, C. J. We shall first consider the nature and legal effect of that part of Mr. Holland's will which bequeaths his estate and interest in the Long Wharf.

This clause in his will is expressed in very few words, in the same words in which he devises the mansion house, as follows : " I give to my wife Sarah Holland, during her natural life, all my mansion house and appurtenances, with the furniture and stores as the same shall remain at my decease ; and my pew in the Federal Street Meeting-house ; also the income and profits of my right in the Boston Pier or Long Wharf, being one full share of the same, *i. e.* three warehouses, and one twenty-fourth part of said wharf; and at her decease the said mansion house, with the remainder of the furniture and stores, if any, the pew, and also the said right, to be divided among my children, share and share alike, and to the heirs of their bodies respectively."

This, we think, was a devise of the real estate to the wife for life. A devise of the whole income and profits of real estate, especially when not in trust, and when it is followed by a gift over, is a devise of the estate itself, as a freehold. It is like a devise of the improvement, or the use, of real estate described. The devise over, after the determination of the life estate, was of a remainder; and being to the five children severally, and to the heirs of their bodies respectively, it was a remainder in tail of one undivided fifth to each.

We are then to inquire to what subjects this bequest applies. The pew was personal estate, made so by statute, declaring the tenure of pews in Boston. *Sts.* 1795, *c.* 53 ; 1798, *c.* 42. Rev. Sts. *c.* 60, § 31. The mansion house was real estate ; and it does not appear that any furniture or stores remained ; and fur-ther, as to this part of the bequest, no question arises in this

suit, because no money appears to have come into the hands of the administrator as the produce of such furniture or stores.

In regard to the Long Wharf, the testator seems to have devised, under the designation of his right, three warehouses standing on the wharf, and one twenty-fourth part of the common and undivided interest in the proprietary, or the incorporated proprietors. And without going further at present, we may say that it appears, from the facts in the case, that, at an early period, these proprietors made partition of a portion of their common and undivided land, by assigning to each proprietor, to hold in severalty, three warehouse lots, two in the upper and one in the lower division, upon which they respectively built warehouses, each at his own expense. The title to these lots ceased to be common property, or under the control of the corporation, except perhaps that by the terms of their deed of partition in 1715, recognized in their act of incorporation in 1772, these separate warehouses were, under special circumstances, liable to assessments for repairs, necessary as well to the security of the warehouses as to the wharf. They were in all other respects real estate held in severalty by the testator in fee, and therefore the will operates upon them directly, in the same manner as upon any other real estate. Indeed, it is doubtful whether these three warehouses, though standing on the wharf, would have passed by force of a devise of "my right in the Boston Pier, being one full share of the same," had not the explanatory and enlarging clause been added, under an *id est,* "three warehouses and one twenty-fourth part of said wharf." This brought the warehouses within the operation of the devise.

In regard therefore to these warehouses, we consider that they were embraced in the devise to the wife for life, with remainder in tail to each of the children of one fifth ; and that the will operated upon them directly to pass them, according to the form of the gift, immediately upon the death of the widow. It further appears that the administrator and trustee never sold them, nor any part of them, pursuant to the power of sale given him by the will, and no money ever came to him, as the proceeds of sale or otherwise, from these warehouses, except the annual rents pay-

able to the widow. The inquiry therefore is limited to the question respecting the money received by the defendant Cruft, as the administrator, from the various sales of real estate made by the corporation to the City of Boston, and afterwards to the United States.

2. It then becomes necessary to inquire what estate and interest passed by the devise of one share or twenty-fourth part of the Long Wharf, as expressed in the will. The nature and character of the property must be learned by their act of incorporation, passed before the Revolution, in June 1772. [*Ante,* 164, *note.*]

It is very clear, in the first place, that from 1715 to 1772 the proprietors were tenants in common of an undivided real estate, and that this act had no effect to change that tenure. The mere act of incorporation of tenants in common does not transfer the fee of the estate from the individuals to the corporation. *Leffing-well* v. *Elliott,* 8 Pick. 455. The object was to make them a proprietary, a qualified species of corporation well known in our early history, established to enable a large number of tenants in common the more conveniently to hold, manage and dispose of their estate. In 1712 a general act was passed, authorizing an easy method, by application to a justice of the peace, to enable such persons to incorporate themselves ; and was extended to wharves in 1735. Anc. Chart. 402, 500.

It is hardly necessary to go at large into the early laws constituting proprietaries—their organization, capacities, powers and modes of action—because they are familiar and well understood. It appears manifestly, from the preamble to this act, and all its enactments, that its purpose was to extend to the owners and tenants in common of this large estate, and to *their heirs,* corporate powers, the better to enable them to manage and improve their estate ; and the reason why they did not adopt the usual course under the general law, by applying to a justice of the peace, obviously was because, from their peculiar condition, they required superadded powers. They owned the wharf in common, and this would naturally yield a considerable income. But they had made partition of warehouse lots to hold in sev-

eralty    But if the wharf should go to decay, the warehouses and the lots on which they stood would be worthless. This being foreseen, a reservation had been made in the partition, that these lots, though held in severalty, should be subject to regulations for the common good. An exigency had arisen, requiring an expensive new stone head, for the general security of both wharf and warehouses, which several years' wharfage might be insufficient to pay ; and therefore they needed and unanimously petitioned for the additional power to subject the proprietors, holding in severalty, to assessment towards an expenditure necessary to the security of their several property; and this was granted by the act of incorporation. It is quite manifest therefore that, in constituting this proprietary, consisting of tenants in common by special agreement, the purpose was to give them in that capacity some special powers, necessary to their condition, and not to change the tenure by which their several estates as tenants in common were held.

Thus the property stood until the passing of the additional act of 1806. *St.* 1806, *c.* 11. This act in terms declared them capable in law, in their corporate name and capacity, to purchase, have, hold, enjoy and possess the land of the Island Wharf, together with all such lands as the same proprietors should judge necessary or expedient for the improvement of the wharf and for widening the passages thereto, limited to a certain distance, and not exceeding a certain value. We are of opinion that, although such purchase would vest the fee in the corporation, yet, as it was exclusively to benefit and add to the conve nience and value of the estates of the proprietors, it was held to the beneficial use of the proprietors, as tenants in common, in proportion to their interests. The further enabling act of 1824, *c.* 2, is in exactly the same terms, and we think must have the same construction. The fee in the lands purchased under both these acts was, by the terms of the grants, vested in the corporation ; but it was for the use and benefit of the proprietors, as tenants in common, and so operated as an accretion to and enlargement of their interest in the proprietary. The conveyances to such a corporation, composed of tenants in common and their

heirs, and incorporated for the purpose of better managing and improving their common estate, including, under the idea of improvement, increased accommodation by ways, easements and other valuable acquisitions, must be considered as an addition to and improvement of their existing estate, and not as the acquisitior of a new one. It is like that of erecting buildings or building a wharf on common land; the value of the whole and of each aliquot part is enhanced, but the nature and quality of the estate is not changed. It was, in legal effect, a conveyance to the corporation, to the use of all the proprietors, in proportion to their aliquot parts of the undivided estate, as tenants in common, and would have vested in them by the statute of uses, but for the obvious consideration that the very purpose of the enabling acts was to vest the fee of the land to be acquired in the corporation, the better to enable them to convey and pass legal titles in their corporate name and capacity. Where such is the obvious intent of a conveyance, which by its terms would operate as a conveyance to uses, and so operate by the *St.* of H. 8 to vest the use in possession, then, by an early construction of the statute, where, taking the whole instrument together, it was apparent that it was not intended to have the effect to vest the use in possession, or where the obvious purpose of the conveyance was to have the fee vest in the grantee, and not pass to the *cestui que use,* it should be held that the fee remained vested in the first grantee; and to distinguish this from a use vested in possession by the statute, it was denominated a conveyance in trust, and the grantee a trustee. And we take this to have been the origin of trust interests in real estate. But except as to remedies, which, in general, a *cestui que trust* must seek in a court of equity, he is regarded as the owner. He is said to have an equitable estate in fee, or in freehold, according to the terms of the trust. Such an equitable estate in fee may be devised. *Newhall* v. *Wheeler,* 7 Mass. 189. Such an equitable estate will give a settlement, in cases where the statute requires a freehold *Orleans* v. *Chatham,* 2 Pick. 29.

That aggregate corporations may take and hold property in trust, for the accomplishment of the purposes for which they

were constituted, seems never to have been doubted ; the only question has been, whether they could so take real estate for purposes alien to that of their incorporation. *First Parish in Sutton* v. *Cole,* 3 Pick. 232. *Bartlet* v. *King,* 12 Mass. 537. So, in a recent case, where several persons purchased land for the erection of a meeting-house, and organized themselves as a proprietary under the *St.* of 1783 ; it was held that as such corporation they held the estate in trust for those who should become holders of pews, for the time being, in the meeting-house to be erected.· *Congr. Soc. in North Bridgewater* v. *Waring,* 24 Pick. 304. Proprietors, thus incorporated, (and an incorporation by special act cannot be less available,) were held capable of selling and disposing of their common lands, by vote or by deed. 4 Dane Ab. 72, 73. *Rogers* v. *Goodwin,* 2 Mass. 475.

Upon any other supposition, than that the lands purchased in pursuance of the acts of 1806 and 1824 were to be used, reconveyed and disposed of, like their other lands, with the single exception that the fee of these lands was in the corporation, but solely for the use of the proprietors, the property in shares must have been of a most anomalous character. It would require the proprietors to keep separate accounts, both of the income and proceeds of sale, of the different estates ; the right in shares held by the same individual would require, for one part of his share, a conveyance by deed, for another part, a transfer by certificate ; different modes of conveyance, different modes of attachment and levy for debts would be required, in respect to different parts of one and the same share, or part of a share. But to hold that the effect of the acts of 1806 and 1824 was not to change the quality, but to enlarge the quantity of interest in the shares held before, renders the acts compatible with each other, and the rights held under them intelligible, practicable and beneficial.

A share was then an aliquot part of the common estate in fee, as tenant, with a trust estate in a like aliquot part of estate held by the corporation under an enabling act, in trust for each proprietor ; and thus the trust estate in realty was inseparably connected with the real estate, and passed with it, enhancing its value, but not changing its character.

. With these views of the law, we come to the conclusion that, prior to the first act of incorporation of 1772, a right or share in the Boston Pier or Long Wharf was a twenty-fourth part of the estate held by the proprietors, as tenants in common; that that act did not change the nature and character of the estate, or vest the fee in the corporation, such vesting of the fee not being necessary to the accomplishment of the purpose for which they were incorporated, but that purpose being to clothe the tenants in common, for the time being, with corporate powers as a proprietary; but the statutes of 1806 and 1824 having enabled the corporation to take a conveyance in fee of adjoining property, to the use of the proprietors, that the purchases made under these acts, and the deeds by which they were carried into effect, vested a fee in the corporation, in trust for the proprietors, to be used, managed and disposed of, for their benefit; that such trust estate was annexed to, and inseparably connected with the legal estate, before held by the several proprietors; that the original share or right, being real estate, the addition to and enlargement of it by such trust, must also, for the purpose of passing title, if not for all purposes, be deemed real estate, and that the devise in the will of the testator, John Holland, of " my right in the Boston Pier or Long Wharf," so far as it extended to one twenty-fourth part of the said wharf, independent of the three warehouses, to his wife for her life, and at her decease to be divided among his children, share and share alike, and to the heirs of their bodies respectively, must be regarded and applied as a devise of the real estate.

This view of the rights of these corporators, seems, by the facts agreed, to be conformable to their own, and to the practice uniformly adopted of considering and dealing with this property as real estate, and transferring it only by deed.

The same understanding is implied in the act of March 2d 1826, (*St.* 1825, *c.* 117,) making the proprietors, in their corporate capacity, capable of taking and holding the pier itself, and all the estate then held by them as tenants in common, providing for the transfer of the several interests of the proprietors to the corporators, and the division of their stock into two hundred shares,

and the issuing of certificates therefor.   This act was undoubt-
edly passed at the request of the proprietors, and is evidence of
their sense of their own rights at that time ; though having been
passed after the transactions in question in this suit, it can have
no other bearing on the present case.

The dates inserted in the agreed statement, with a view to
raise the question whether the will might not be inoperative to
pass the testator's interest in certain portions of Spear's Wharf
and Bray's Wharf, being afterpurchased estate, might be mate-
rial, had the conveyance been made direct to himself.   The deeds
were given to the corporation ; his interest was a right through
and under them.   That right, as real estate, he held when he made
his will, and when he died.   That right was entire and integral ;
and although the corporation might be undergoing continual
changes, by buying, selling, contracting, giving or receiving mort-
gages, and other acts affecting their legal estate ; yet that integral
right was one and the same, and embraced whatever they po-
tentially could command, through the means held by them as
trustees, as well as what they at any one time actually held as
trustees; that right passed, and it is in virtue of the devise of
that right, that any party holds under the will.   Having decided
that a right in the Long Wharf is real estate, and that the trust
estate in additional lands which the corporation was enabled to
purchase and hold in trust for the proprietors is incident to the
realty and passes with it, then a conveyance or devise of that
right is a conveyance or devise of all that is incident to it, and
passes with it.   This conclusion is strengthened by a consider-
ation of the reason on which it was held, before Rev. Sts. c. 62,
§ 3, that real estate purchased after the execution of the will did
not pass.   By the common law, a devise is regarded as a con-
veyance, and the devisee a purchaser ; and although the will
does not take effect till the death of the testator, yet, when it
does take effect, it relates back to its date.   Then, on the rule
non dat qui non habet, he shall not be intended to give what he
did not then have the power to give.   But no such reason can
apply to this case.   The testator, when he made his will, did
own that right, being real estate, in virtue of which, as an inci-

dent, the corporation had power to acquire, and did afterwards acquire property in trust for the owner of that share. The real estate, therefore, of which the corporation took deeds as trustees, after the making of the will, was not real estate vested in the testator, and therefore was not after acquired estate, within the rule which excludes such estate from the operation of the will. It appears to us, therefore, that the dates of the deeds to the corporation are immaterial.

4. The next question, in determining who is entitled to the money in the hands of Cruft, depends upon the will, and the rules of law governing it. It is clear that when the devise was made, and when it took effect by the death of the testator, the subject on which the devise operated was real estate, and the devise gave a freehold to the widow for her life, with remainder in tail to the five children. But in point of fact, after this devise took effect, a considerable part of the property devised was con‧verted into personal estate. Indeed the testator, by his will, had given a power to his executor, and to any administrator with the will annexed, to sell and dispose of all his real and personal estate, and to sell and give deeds of his real estate without license, not for the payment of debts, but after his debts were all paid, and whenever, in his judgment, such sale should be most for the benefit of the parties concerned. He also authorized such executor or administrator to invest the proceeds in safe and productive stocks, or other secure and permanent funds. He thus constitutes the executor or administrator a trustee, whether he would have been one by virtue of his office or not. He does not himself declare the trusts ; but this is immaterial, because they result by implication of law to those who would have had the beneficial use of the estate of which the money was the pro‧ceeds. The testator, in recommending to his executor to sell the entire real and personal property, manifested no intent to alter the ultimate beneficial disposition of his property, but only to make it more beneficial to those entitled.

Now, although the administrator did not execute the powers of sale vested in him by the will, yet by another mode a part of the devised property was converted into money, and did come

into his hands, as administrator and trustee. The property was sold, and a conveyance thereof made by the corporation, who, we are to presume, acted rightfully therein, both as empowered by the original act to manage and dispose thereof, so far as it was the original property and estate of the proprietors, and as trustees and holders in fee, so far as it consisted of estate pur · chased under the two enabling acts. In point of fact, the whole of the estate sold, and from the proceeds of which the money in controversy was derived, was land purchased under the act of 1806 or that of 1824, to wit, part of the Spear's Wharf and Bray's Wharf estates on the north, purchased under the act of 1824, and the Island Wharf on the south, under the act of 1806. Indeed the validity of those sales by the corporation is not in question in this suit. Both parties affirm it, by claiming the proceeds of them in the hands of the trustee.

But it is immaterial by what mode real estate is converted into personal, whether by a trustee with power to sell and hold and apply the proceeds, or by a devisee for life, with power to sell and take the income for his own life, by decree or license of any court of competent jurisdiction, or even when such conversion is constructively effected, by articles stipulating to lay out money in land and convert land into money to particular uses. Whatever be the mode, the fund takes the place of the land which yielded it, and is liable to stand in its place, and be applied and ultimately disposed of, in the same manner, until the object is accomplished. *Fletcher* v. *Ashburner*, 1 Bro. C. C. 497. The general doctrine is stated and illustrated in many cases. *Lechmen* v. *Earl of Carlisle*, 3 P. W. 211. *Elwin* v. *Elwin*, 8 Ves. 547. *Thornton* v. *Hawley*, 10 Ves. 129. *Wheldale* v. *Partridge*, 5 Ves. 388. *Craig* v. *Leslie*, 3 Wheat. 563. *Emerson* v. *Cutler*, 14 Pick. 120. So when land held in trust is taken for public use, under the right of eminent domain, the money paid for it stands in its place, subject to the same trust and to the same ultimate disposition. *Gibson* v. *Cooke*, 1 Met. 75.

The principle therefore appears to be fully settled, both upon well considered reasons of justice and expediency, and upon a

series of authorities, that where land is devised as real estate, and either by the direction of the testator himself, or by oper- ation of law, such real estate is converted into money for the purpose of better investment, or for any other purpose consistent with the design and purpose of the ultimate destination to which the real estate was appropriated, there the money is substituted for, and stands in the place of the devised real estate, and shall go to the same persons and in the same proportions, and vest in possession and enjoyment at the same times and upon the same contingencies, which would have affected the real estate, had it remained specifically in real estate.

And we think this rule applies to the present case, and must apply to and regulate the disposition of the fund in the hands of the administrator and trustee. It was devised to the wife for life, with a remainder in tail, and the devise took effect and vested the estate in the widow, and during the continuance of that particular estate, the real estate was converted into personal; this event, though in a different form, had been contemplated by the testator, and yet no intention or purpose was indicated in the will, to give a different destination to the money from that which he had given to the real estate; the conversion was made for no purpose requiring a different disposition of the money, as the payment of debts or legacies, and therefore the money must go in beneficial enjoyment to those who would have been en- titled to the real estate, and in the same proportions.

5. The only remaining question is, how would the real estate have vested, by force of the will, in the events which have happened.

In the first place, it is proper to notice a marked distinction between this case and the very common one in which a testator directs his estate to be sold after his decease, and a disposition made of the proceeds. There, at the decease of the testator, the estate, being then real, descends to the heir at law; the power of sale by the executor operates to devest the estate of the heir, and therefore, until a sale, the heir is entitled to the rents and profits, and upon a sale made, there is a resulting trust for the heir at law in the proceeds, or such part of them as have not

been disposed of by the testator to other uses, in express terms or by necessary implication. But in the present case the real estate was converted into personal during the subsistence of the particular estate, so that at the moment of the decease of the tenant for life no real interest remained to descend to the heir, and the will took effect upon the proceeds immediately, as it would have done upon the real estate, had it specifically remained.

Now, as Samuel M. Holland, who had the first remainder in tail under the devise, died during the life of the tenant for life, the right descended to his issue in tail, and the estate never vested in possession and enjoyment in Samuel M. Holland; in other words, he was never seized of the estate as an estate tail in possession. At the time of the decease of Sarah Holland, John Holland, the plaintiff, was the next heir in tail, and entitled to enter upon and hold the estate, as an estate tail, with all the incidents thereto—among others, the power of barring the entail and putting an end to all remainders and reversions by a common recovery ; or as the law stood before the revised statutes, by force of *St.* 1791, *c.* 60, § 1, he could accomplish the same object by a deed, executed in presence of two witnesses, for a good or valuable consideration, *bona fide* and acknowleged ; or after the passage of the revised statutes, the same effect might be produced by a deed in common form, which would be valid to pass an estate in fee. *Lithgow* v. *Kavenagh,* 9 Mass. 161. *Cuffee* v. *Milk,* 10 Met. 366. So it would be liable for his debts, either by being attached and set off during his life, or by a sale by his administrator under a license after his decease. So it would be subject to dower ; or, if the tenant in tail were a wife, to curtesy. So, during his lifetime, if he became *non compos,* it might be made liable for his debts by a sale made under license by his guardian. *Williams* v. *Hichborn,* 4 Mass. 189.

But all these considerations apply to a tenant in tail in possession, to one actually seized of an estate, and cannot apply to a remainderman, whose title is not vested in possession. And there seems to us to be great reason for this distinction. A tenant in tail in possession has an actual vested estate of inheritance, attended with the usual incidents of full dominion—free

dom from waste; dower and curtesy; and a power, at his own will, to convert it into an absolute estate, both by the common law and by statute. None of these qualities and incidents can be attributed to the right of an heir in tail in remainder, during the holding and possession of a prior tenant of the freehold. His right of entry, of enjoyment, of any beneficial occupation or use, depends on a contingency, that is, of his surviving the previous tenants; if he does not, at the decease of the previous tenant, if the entail has not been barred, the right has descended to the next heir in tail, who can at once enter and become seized ; if there are no issue in tail, it may go to the next devisee in tail, or the heirs of his body, to whom an estate tail was limited, because by the same devise any number of estates tail may be limited one after another; and even when all the issue in tail of all those to whom the estates tail in remainder were so limited are exhausted, the estate reverts to the devisor or his heirs.

This view we think is confirmed by the statutes. The Rev. Sts. *c.* 59, § 3, provide that any person, actually seized of lands as tenant in tail, may convey in fee simple, by deed in common form, which shall bar all remainders and reversions. The Rev. Sts. *c.* 60, § 29, declare that all lands held in fee tail shall be liable for the debts of the tenant in tail, both in his lifetime and after his decease ; but this shall not extend to lands in which the debtor has only an estate tail in remainder. The report of the commissioners, in their notes to these sections, shows that they intended to make no change in the law, except to enable any person, actually seized of lands as tenant in tail in possession, to pass them in fee simple by a common deed, and also, without affecting the validity of the bar of the entail, to take back an estate in fee simple to himself. In all other respects, we think they leave the law as it stood before, except perhaps by a more explicit declaration in terms, of that which before rested in implication. For ascertaining this, let us look at the law as it previously stood. The *St.* of 1791, *c.* 60, § 1, after reciting the delays and expenses incident to the existing mode of barring estates tail by common recovery, provides that any person who may be seized and possessed of any lands, &c., in fee tail, may, by deed duly ex-

ecuted before two witnesses, and acknowledged and recorded, bar all estates tail in such lands, &c. This designates very clearly one seized and in actual possession. Section 2, which renders lands liable for the debts of tenant in tail, is supposed, in the argument of the case before us, to extend further; it provides that all lands, &c. held in fee tail shall be liable to the payment of the debts of the tenant in tail, in the same manner as other real estates. Here it is " *lands held* in fee tail," for "the debts of the tenant in tail," " as other real estates." These terms distinctly apply to an estate in possession, as the term " held" implies. Not a mere right as tenant in tail in remainder, but " lands held," and for the debts of a tenant so holding. On any other construction, estates might be taken to satisfy the debt of a party, who could not convey or charge the realty by his deed, and, upon the decease of the tenant to the freehold, the estate would be liable for the debts of the intermediate tenants in tail, however numerous, who had died before the death of the tenant for life; a supposition too extravagant to be entertained.

But it appears to us decisive of the point, that, as well in the statute of 1791 as in the revised statutes, the declared purpose was to bar an estate by the simple process of executing a deed, as a substitute for the dilatory and expensive expedient of suffering a common recovery. Of course, the power of barring the entail by deed could only be executed by one capable of suffering a common recovery. It is a familiar rule that a common recovery can be suffered only by one who has an actual estate in possession, because none other can convey a freehold, or be a tenant to the præcipe, against whom the writ must be brought. 5 Cruise Dig. tit. 36, *c.* 2, § 19. That it cannot be suffered by one having an estate in remainder was determined in the case of *Parkhurst* v. *Smith,* 6 Bro. P. C. (2d ed.) 351. If indeed a party be tenant in tail in remainder, expectant immediately upon the determination of a life estate, then, by a concurrence of the tenant for life and the next immediate tenant in tail, a common recovery may be suffered, because the life estate is thereby surrendered, and the tenant in tail becomes actually seized of an estate tail in possession. These rules are well illustrated in both points by the case of *Goodtitle* v. *Duke of Chandos,* 2 Bur. 1065.

We are therefore of opinion that, though the language is less explicit, by the legal operation of *St.* 1791, *c.* 60, § 2, as by that of the revised statutes, the liability of lands to be taken for the debts of a tenant in tail does not extend to lands of which the debtor has only an estate tail in remainder, which has never vested in possession.

During the life of the widow, neither she, nor the tenants in tail in remainder, without concurrence, could have barred the entail; not she, because she had a life estate only; nor they, because they were not tenants in tail in possession. Had the tenant for life and the next remainderman united, they might have barred the entail by their deed, by the authority of *St.* 1804, *c.* 59, which is a plain recognition and affirmance of the rule of the common law.

Another argument, relied on to show that this estate would have been liable for the debts of Samuel M. Holland, was drawn from the statute provisions and the cases under them, showing that a vested remainder may be levied on for debt, transferred by deed, devised and treated in most respects as real estate. But we think it will be found that they were all remainders in fee. As far as we have examined the cases cited, they are of that character. *Whitney* v. *Whitney*, 14 Mass. 88, was the case of a devise to one for life, then to his heirs; and held to be not a remainder, but to pass by inheritance. *Williams* v. *Amory*, 14 Mass. 20, was the case of a levy on a vested remainder in fee, during the life of tenant for life, and held good. *Williams* v. *Hichborn*, 4 Mass. 189, was an estate tail in possession, vested in a person *non compos*, and sold by his guardian, and the sale held good. But we have seen no authority for holding a remainder in tail liable for the debts of the tenant in tail, who has not come into possession.

The court are therefore of opinion that as Samuel M. Holland had no other interest than that of a tenant in tail in remainder, and died during the life of the tenant for life, thereupon the right descended to the plaintiff as heir in tail, the estate was never liable for the debts of Samuel M. Holland, and therefore the claim of his administratrix cannot be sustained.

This is entirely distinguishable from the case of *Holland* v. *Cruft*, 20 Pick. 321, which arose under the same will, and concerned a bequest of real and personal estate other than the Long Wharf and the mansion house. That was a bequest of real and personal estate, with a recommendation and power to convert the real estate into personal. The testator then directed that so soon as his youngest child should come of age, the whole should be divided into equal parts, one to each child then living, and to the heirs of their bodies respectively. Now, although that bequest was in tail, like the present, there was no intermediate estate for life or otherwise, and the estate tail immediately vested in possession, and Samuel M. did not take a remainder. So far as the clause affected personal estate, the limitation to heirs of the body was void, and the right vested forthwith absolutely in the first taker, though perhaps the payment was suspended. But even supposing the time of vesting suspended, it was suspended only till the youngest son came of age, and it appears that Frederick, the youngest child, came of age in 1832, and Samuel M. survived till 1833, before which the right of Samuel M. became absolute as to the personal, and he became tenant in tail in possession as to the real; and so the estate was liable for his debts to the extent of his right as heir in tail to one fifth. It was therefore held, quite consistently with the rules adopted in the present case, that both were liable for the debts of the tenant in tail, and that his administratrix had a right to recover.

The principles thus stated must, we think, dispose of any claim on the part of the assignee, Weld, if they were not otherwise disposed of by the former case, as fraudulent against creditors. No interest could pass by the assignment of a tenant in tail in remainder, except perhaps by way of estoppel against the assignor himself; and no conveyance by such remainderman could affect the right of the issue in tail, or of any other tenant in tail in remainder, or of the reversioner. If it could have any effect by way of estoppel, it must be upon the contingency that the event should happen upon which the assignor's right as a remainder would become a tenancy in tail in actual possession, by the death of the tenant to the freehold during his own life.

As that event did not happen, the assignment could have no effect. But in *Davis* v. *Hayden*, 9 Mass. 514, it was held that nothing passed by a deed of the tenant in tail in remainder, during the life of the prior tenant to the freehold.

As to the right of the sisters of John Holland, we think it quite clear that if the estate had remained, and not been converted into money, it would have descended to the plaintiff as heir in tail, to the exclusion of sisters and younger brothers, if any ; and this principle has been always held in this commonwealth. One authority to this point is the case, just cited, of *Davis* v. *Hayden*, 9 Mass. 514.

The decrees of this court in 1826 do not affect the rights of the plaintiff. The object of those suits was, to ascertain whether the whole of the sums, received for sales of land to the city of Boston, was to be regarded as income, and therefore paid to the widow, or whether she was entitled only to the income of those sums for life ; and the court decreed that she was entitled to the income only, and that the principal sums, on her decease, should go " to the children of John Holland or their legal representatives, according to the tenor of the will aforesaid," thus referring to the will as a rule of distribution. The question whether these sums were to be treated as real or personal estate does not appear to have been brought to the notice of the court; and the inadvertent insertion, in the decree, of a direction that the fund should be distributed by the judge of probate, cannot affect the rights of the remainderman in tail.     *Decree for the plaintiff*